**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
_____
:
**SECURITIES AND EXCHANGE COMMISSION,**    :
:
                    **Plaintiff,**    :
:
       **-against-**    :
:
**GLOBAL INVESTMENT STRATEGY UK LTD. and**    :
**JOHN WILLIAM GUNN,**    :
:
                **Defendants.**    :
_____:


### PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE COMPLAINT

David Stoelting
Securities and Exchange Commission
New York Regional Office
200 Vesey Street, Suite 400
New York, NY 10281-1022
(212) 336-0174
stoeltingd@sec.gov
*Attorney for Plaintiff*

May 7, 2021

# TABLE OF CONTENTS

PRELIMINARY STATEMENT . . . . . . . 1

BACKGROUND: CLEARING BROKERS' ROLE
IN THE SECURITIES MARKETS . . . . . . . 3

THE COMPLAINT'S FACTUAL ALLEGATIONS. . . . . 4

    I.     GIS and Gunn: Background . . . . . 4

    II.    GIS Solicited U.S. Customers . . . . . . 5

    III.   GIS's U.S. Customers:
          Backers and Day Traders. . . . . . 5

    IV.   GIS Provided More Leverage
          Than U.S. Brokerage Firms . . . . . . 6

    V.    GIS Received Transaction-Based Compensation
          From Its U.S. Customers . . . . . . 6

    VI.   Gunn Directed and Participated in GIS's
          Operations, Including for U.S. Customers . . . . 7

SERVICE: FACTUAL AND PROCEDURAL BACKGROUND . . . 8

ARGUMENT . . . . . . . . 9

    I.     THE COURT SHOULD DENY GUNN'S MOTION
          TO DISMISS UNDER RULE 12(b)(5), BECAUSE
          THE SEC PROPERLY SERVED GUNN. . . . . 9

    II.    THE COURT SHOULD DENY GUNN'S RULE 12(b)(2)
          MOTION TO DISMISS BECAUSE THE COURT HAS
          PERSONAL JURISDICTION OVER HIM. . . . . 13

          A. Standard of Review . . . . . . 13
           .

          B. The Court Has Personal Jurisdiction Over Gunn.. . . 14

III.    THE COURT SHOULD DENY DEFENDANTS' RULE 12(b)(6)
        MOTION TO DISMISS BECAUSE THE COMPLAINT
        STATES A CLAIM FOR RELIEF.    .       .       .       .       .       17

        A.  Standard of Review       .       .       .       .       .       .       17

        B.  The Complaint Adequately Alleges That GIS Acted as a Broker       17

        C.  The Complaint Adequately Alleges
            Domestic Securities Transactions.       .       .       .       .       20

        D.  The Complaint Cannot Be Dismissed Based on
            Defendants' Safe-Harbor Exemption Claim Because
            That Is An Affirmative Defense. .       .       .       .       .       22

        E.  The Complaint Adequately Alleges that Gunn
            Aided and Abetted GIS's Section 15(a) Violation.       .       .       24

CONCLUSION       .       .       .       .       .       .       .       .       .       27

**TABLE OF AUTHORITIES**

**Cases**

*Absolute Activist Value Master Fund Ltd. v. Ficeto*,
677 F.3d 60 (2d Cir. 2012) . . . . . . . . 21

*Ackermann v. Levine*, 788 F.2d 830 (2d Cir. 1986) . . . . . 9

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) . . . . . . . 17

*SEC v. Benger*, 934 F. Supp.2d 1008 (S.D.N.Y. 2013) . . . . 22

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007). . . . . . 17

*BRF S.A. Securities Litigation*,
18-cv-2213 (PKC), 2019 WL 257971 (S.D.N.Y. Jan. 18, 2019) . . . . 12

*Brockmeyer v. May*, 383 F.3d 798 (9th Cir. 2004). . . . . . 11

*Celsion Corp. v. Stearns Mgmt. Corp.,* 157 F.Supp.2d 942 (N.D. Ill. 2001) . . 18

*Chambers v. Knight*,
No. 18-cv-2906-BAS, 2019 WL 1923936 (S.D. Cal. Apr. 30, 2019). . . 10, 11

*Chillemi v. Town of Southampton*, 943 F. Supp. 2d 365 (E.D.N.Y. 2013). . . 23

*City of Pontiac Policeman's and Fireman's Retirement System v. UBS AG*,
752 F.2d 173 (2d Cir. 2014) . . . . . . . . 22

*Cornwell v. Credit Suisse Group*, 729 F. Supp. 2d 620 (S.D.N.Y. 2010). . . 22

*Cortec Indus., Inc. v. Sum Holding,* 949 F.2d 42 (2d Cir. 1991) . . . 26

*In re Coudert Brothers LLP*,
No. 16-cv-8237, 2017 WL 1944162 (S.D.N.Y. May 10, 2017). . . . 9

*Das v. Rio Tinto PLC*, 332 F. Supp. 3d 786 (S.D.N.Y. 2018). . . . 16

*Duravest, Inc. v. Viscardi, A.G.*, 581 F. Supp. 2d 628 (S.D.N.Y. 2008) . . 16

*Evriholder Products LLC v. Simply LBS Ltd., No.,*
17-cv-4329, 2020 WL 7060336 (S.D.N.Y. Apr. 4, 2020). . . . . 10

*Exxon Mobil Corp. v. Schneiderman*, 316 F. Supp. 679 (S.D.N.Y. 2018). . . 15

*FTC v. Ken Roberts Co.*, 276 F.3d 583 (D.C. Cir. 2001). . . . . 19

*Hack v. President & Fellows of Yale Coll.*, 237 F.3d 81 (2d Cir. 2000). . . 25

*Henry Haining Zhang v. Kon Ki Lo*,
No. 14-cv-6945-CM, 2020 WL 2133163 (S.D.N.Y. 2020). . . . . 16

*Jazini v. Nissan Motor Co.*, 148 F.3d 181 (2d Cir. 1998) . . . . . 13

*Jonas v. Estate of Leven*, 116 F. Supp. 3d 314 (S.D.N.Y. 2015). . . . 13

*Kyung Sup Ahn v. Rooney, Pace Inc.*, 624 F. Supp. 368 (S.D.N.Y. 1985) . . 19

*Landry v. Price Waterhouse Chartered Accountants*, 715 F. Supp. 98 (S.D.N.Y.1989). 14

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161 (2d Cir. 2013). . 14

*Loginovskaya v. Batratchenko*, 764 F. 3d 266 (2d Cir. 2014). . . . 21

*MacDermid, Inc. v. Deiter*, 702 F.3d 725 (2d Cir. 2012). . . . . 13, 21

*Mass. Fin. Servs., Inc. v. Sec. Investor Protection Corp.*,
411 F.Supp. 411 (D. Mass. 1976) . . . . . . . . 18

*Mende v. Milestone Tech., Inc.*, 269 F. Supp. 2d 246 (S.D.N.Y. 2003). . . 9

*Metro. Life Ins. Co. v. Robertson–Ceco Corp.*, 84 F.3d 560 (2d Cir. 1996) . . 14

*Morrison v. National Australia Bank*, 561 U.S. 247 (2010) . . . . 3, 20, 21

*Northrop v. Hoffman of Simsbury, Inc.*, 134 F.3d 41 (2d Cir.1997) . . . 25

*Oneida Indian Nation of N.Y. v. County of Oneida*,
617 F.3d 114 (2d Cir. 2010). . . . . . . . . 25

*In re Petrobas Securities Litigation*, 150 F. Supp. 3d 337 (S.D.N.Y 2015) . . 21

*Polagrid LLC v. Videsh Sanchar Nigam Limited*,
No. 04-cv-9578, 2006 WL 903184 (S.D.N.Y. Apr. 7, 2006) . . . . 10

*Regional Props. v. Financial & Real Estate Consulting, Co.*,
678 F.2d 552 (5th Cir. 1982) . . . . . . . . . 18

*Rosen v. Brookhaven Cap. Mgmt., Co.*,
194 F. Supp. 2d 224 (S.D.N.Y. 2002) . . . . . . . 23

*Rosquist v. New York Univ. Med. Ctr.*,
No. 97 Civ. 8566 (JGK), 1998 WL 702295 (S.D.N.Y.) . . . . 13

*SEC v. Apuzzo*, 689 F.3d 204 (2d Cir. 2012) . . . . . . 24

*SEC v. Art Intellect, Inc.*,
No. 2:11-CV-357, 2013 WL 840048 (D. Utah Mar. 6, 2013) . . . 18

*SEC v. Benger,* 934 F. Supp.2d 1008 (S.D.N.Y 2013) . . . . 22

*SEC v. DiBella*, 587 F.3d 553, 566 (2d Cir. 2009) . . . . 24

*SEC v. Falstaff Brewing Corp.*, 629 F.2d 62, 77 (D.C. Cir. 1980) . . 25

*SEC v. Paulson*,
No. 18 Civ. 6718 (PGG), 2020 WL 6263180 (S.D.N.Y. Oct. 23, 2020) . . 25

*SEC v. Rabinovich & Assocs., LP*,
No. 07 Civ. 10547 (GEL), 2008 WL 4937360 (S.D.N.Y. Nov. 18, 2008) . . 18

*SEC v. Ralston Purina*, 346 U.S. 119 (1953).. . . . . 23

*SEC v. Softpoint, Inc.*, No. 95-cv-2951, 2001 WL 43611 (S.D.N.Y. Jan. 18, 2001) . 14, 15

*SEC v. Straub,* 921 F. Supp. 2d 244 (S.D.N.Y. 2013). . . . . 14, 15

*SEC v. Unifund SAL*, 910 F.2d 1028 (2d Cir. 1990). . . . . . 14

*SEC v. Wey*, 246 F. Supp. 3d 894 (S.D.N.Y. 2017) . . . . 24

*SignalQuest, Inc. Tien-Ming Chou*, 284 F.R.D. 45 (D.N.H. 2012) . . 13

*TAGC Mgt. LLC v. Lehman,* 842 F. Supp.2d (S.D.N.Y. 2012) . . . 12

*UBS Asset Mgt. (New York) Inc. v. Wood Gundy Corp.*,
914 F. Supp. 66 (S.D.N.Y. 1996) . . . . . . . 23

*United States v. Continental Illinois Nat'l Bank and Trust Co. of Chicago*,
889 F.2d 1248 (2d Cir. 1989). . . . . . . . 23

*Water Splash, Inc. v. Menon*, 137 S. Ct. 1504 (2017) . . . 9

*Wilson v. Merrill Lynch & Co.*, 671 F.3d 120 (2d. Cir. 2011). . . 17

*Wong v. Partygaming Ltd.*,
No. 06-cv-2376, 2008 WL 1995369 (N.D. Ohio May 6, 2008) . . 11

*World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286 (1980). . . . 14

**Statutes**

Exchange Act Section 3(a)(4), 15 U.S.C. § 78c(a)(4) . . . . 4, 18

Exchange Act Section 7, 15 U.S.C. § 78g . . . . . 19

Exchange Act Section 15(a), 15 U.S.C. § 78o(a) . . . . *passim*

Exchange Act Section 20(e), 15 U.S.C. § 78t(e). . . . . 24

**Rules**

Exchange Act Rule 15a-6, 15 C.F.R. § 240.15a-6(a)(1) . . . . 22, 23

Federal Rule of Civil Procedure 4(e) . . . . . . 12

Federal Rule of Civil Procedure 4(f)(2)(C)(ii). . . . . 2, 8-13

Federal Rule of Civil Procedure 8(e) . . . . . . 25

Federal Rule of Civil Procedure 8(f) . . . . . . 25

Federal Rule of Civil Procedure 12(b)(2) . . . . . 2, 13

Federal Rule of Civil Procedure 12(b)(5) . . . . . 2, 9, 13

Federal Rule of Civil Procedure 12(b)(6) . . . . . . 2, 17, 26

**Treaty**

Hague Convention on the Service Abroad
of Judicial and Extrajudicial Documents . . . . . . 9, 10

**Other Authorities**

Henry F. Minnerop, *Clearing Arrangements*, 58 Bus. Law. 917 (2003). . . 3

Thomas Lee Hazen, *Treatise on the Law of Securities Regulation* (2020). . . 4

Plaintiff Securities and Exchange Commission respectfully submits this memorandum of law in opposition to the motion to dismiss the Complaint filed by Defendants Global Investment Strategy U.K. Ltd. ("GIS") and John W. Gunn ("Gunn") (collectively, "Defendants").  For the reasons set forth below, Defendants' motion to dismiss should be denied.

## PRELIMINARY STATEMENT

The SEC's Complaint alleges that, from 2015 through 2019, Defendant GIS—a United Kingdom-based financial services firm—provided securities clearing and settlement services to more than 600 U.S. customers for trades in U.S. securities issued by U.S. entities while failing to register with the SEC as a broker-dealer.  Defendant Gunn—GIS's founder, chairman, compliance officer and principal—directed and participated in this unlawful conduct.

GIS's back-office clearance and settlement services, including holding U.S. securities for U.S. customers, settling customers' U.S. trades, and lending customers money to purchase additional U.S. securities, were services that registered clearing brokers in the U.S. provide to customers.  But GIS offered their U.S. customers something that they could not legally get through a properly registered U.S. broker-dealer:  a much higher rate of margin or leverage—the ability to borrow money from a broker to purchase securities—than U.S. firms are permitted to provide.  In one case, a GIS customer borrowed 167 times the value of the equity in the account from GIS in order to purchase more securities.  GIS's high-risk lending practices, given the billions of dollars' worth of transactions that GIS cleared for its U.S. customers, put the U.S. securities markets at risk if customers ultimately could not pay for the securities they had purchased.  Meanwhile, Defendants profited by charging customers high fees.

Based on these and other allegations, the Complaint alleges that GIS acted as a broker and therefore violated Section 15(a) of the Securities Exchange Act of 1934 ("Exchange Act")

by failing to register with the SEC as a broker-dealer. The Complaint further alleges that Gunn aided and abetted GIS's violations.

Defendants move to dismiss on three grounds: Gunn moves to dismiss under Federal Rule of Civil Procedure 12(b)(5) for insufficient service of process and under Rule 12(b)(2) for lack of personal jurisdiction, and Defendants both move under Rule 12(b)(6) for failure to state a claim. Defendants' arguments misstate the law, ignore the Complaint's factual allegations, and at times make sweeping legal contentions without citing any legal authority.

Gunn first argues that the SEC's service on him under Rule 4(f)(2)(C)(ii), which authorizes service by mail on a foreign defendant through the Clerk of the Court, was invalid. He incorrectly argues that U.K. law "does not contemplate" service by mail, despite clear case law to the contrary. And he contends that, although the SEC served him at GIS's London office and although he apparently received the Complaint as a result, the London office is not his place of business.

Gunn next argues that the Court cannot exercise personal jurisdiction over him because his contacts with the U.S. were too inconsequential to satisfy the "minimal contacts" test. Gunn ignores the Complaint's allegations that he travelled to the United States to meet with U.S. customers, that he sent letters to assure U.S. broker-dealers that GIS would honor and settle its U.S. customers' trades, and that he routinely emailed his U.S. customers.

Defendants finally make several arguments as to why the Complaint fails to state claims against them. Defendants contend—without citing any legal authority—that extending margin or credit for securities transactions does not render a firm a broker. Yet the Complaint alleges a wide range of conduct by GIS that brings it within the statutory definition of a broker in addition to extending margin—including providing clearance and settlement services, holding customer

cash and securities, receiving transaction-based compensation, and soliciting customers for its brokerage services.

Defendants further argue that the Complaint fails to allege a "domestic nexus" and therefore is an improper extraterritorial application of the U.S. securities laws under *Morrison v. National Australia Bank*, 561 U.S. 247 (2010). The Complaint, however, alleges that the transactions at issue occurred in the U.S. and involved U.S. purchasers and U.S. securities. *Morrison* therefore does not apply.

Finally, Gunn argues that the Complaint fails to adequately allege that he aided and abetted GIS's violation because the Complaint fails to allege that he had the requisite scienter. In fact, the Complaint alleges that Gunn directed and therefore knew of GIS's brokerage activities on behalf of U.S. customers while GIS was not registered with the SEC. That and other conduct alleged in the Complaint satisfy the proper pleading standard for scienter.

For these reasons, the Defendants' motion to dismiss should be denied.

## BACKGROUND:
## CLEARING BROKERS' ROLE IN THE SECURITIES MARKETS

Clearing brokers are integral to the operation of the U.S. securities markets. Most brokerage firms in the U.S. are introducing brokers that handle "front office"-type activities that principally involve customer interaction. These tasks include opening, approving, and monitoring customer accounts; providing investment recommendations or accepting customer orders; and executing customer orders. *See* Henry F. Minnerop, *Clearing Arrangements*, 58 Bus. Law. 917, 919 (2003).

Clearing brokers provide "back office" functions such as extending credit in margin accounts; providing written confirmations of executed orders to customers; receiving or delivering funds or securities from or to customers; maintaining books and records that reflect

transactions, including rendering monthly or periodic statements of account to customers; providing custody of funds and securities in customer accounts; and clearing and settling transactions effected in customer accounts. *Id.* (citation omitted). In other words, in contrast to the role of the introducing broker, "the clearing broker handles the customer funds and also operates as a bank with respect to the transaction and the customer's funds generally. . . . [F]or example, if a customer has a margin account, the clearing broker handles the margin-related aspects of the account." 4 Thomas Lee Hazen, *Treatise on the Law of Securities Regulation* § 14:21 (2020).

Section 3(a)(4) of the Securities Exchange Act of 1934 defines a "broker" as "any person engaged in the business of effecting transactions in securities for the account of others." 15 U.S.C. § 78c(a)(4). Brokers, including clearing brokers, are required to register with the SEC under Section 15(a) of the Exchange Act. 15 U.S.C. § 78o(a).

## THE COMPLAINT'S FACTUAL ALLEGATIONS[1]

## I. GIS and Gunn: Background

GIS is a financial services firm registered with the United Kingdom's Financial Conduct Authority ("FCA") and is a member of the London Stock Exchange. ¶ 10. GIS's principal place of business is 2 London Wall Buildings, London, England. ¶ 10. Gunn is a U.K. citizen and resides in London, England. ¶ 11. Gunn is the founder, chairman, compliance officer and principal of GIS. ¶ 11. Neither GIS nor Gunn has ever been registered as a broker-dealer (or in any other capacity) in the U.S. ¶¶ 10, 11.

---

[1] "¶ __" means paragraphs of the SEC's Complaint filed Dec. 22, 2020 (Dkt. 1), unless otherwise noted.

## II.    GIS Solicited U.S. Customers

GIS's website (www.gisukltd.com), accessible in the United States, solicited customers by promoting its "global multi-asset trade execution, clearing, safe custody and stock lending solutions to a combination of financial institutions, fund managers and wealth officers." ¶ 22. GIS's website specifically targeted U.S. customers:  it stated that it provided "dedicated coverage to clients across both U.K. and U.S. trading hours" and that the U.S. Internal Revenue Service listed GIS in its "directory of recognised FATCA [Foreign Account Tax Compliance Act] Foreign Institutions." ¶ 22.

## III.    GIS's U.S. Customers:  Backers and Day Traders

During the relevant period, GIS had at least two types of U.S.-based customers, each with its own type of account.  First, GIS had approximately 40 U.S.-based financial "backers," entities that opened omnibus accounts at GIS.  ¶ 13.  Second, GIS also had more than 600 U.S.-based day traders, who had sub-accounts at GIS that were linked to a U.S. backer's omnibus account. ¶ 13.

The backers and their day traders purchased allocations of securities issued by U.S. companies and governmental entities, among other issuers, using delivery-versus-payment accounts at U.S. introducing broker-dealers.  ¶ 14.  A delivery versus payment account does not hold securities or cash; instead, the day traders instructed their introducing brokers to clear and settle their trades at GIS.  ¶ 14.  The day traders sought to be "flat" at the end of every trading day by making same-day, round-trip transactions — they sought not to have any long or short securities positions at the end of the day that would expose them to market risk overnight.  ¶ 14. GIS required the backers to make a cash deposit when they opened an omnibus account at GIS**,** but did not require the day-trader sub-account holders to maintain any specific cash balances or

equity in their accounts.  ¶ 21.

GIS itself maintained an omnibus account at a U.K. custodial firm, which received the day traders' securities and transferred out cash to settle the securities electronically.  ¶ 15.  The trades settled in GIS's account at the U.K. custodial firm.  ¶ 15.  From 2016 through 2019, GIS cleared and settled more than $44 billion worth of trades for just four of the U.S. backers' omnibus accounts.  ¶ 16.

## IV.	GIS Provided More Leverage Than U.S. Brokerage Firms

U.S broker-dealers are bound by rules limiting the amount a customer can initially borrow from a broker-dealer to purchase an equity security:  generally, 50% of the current market value of the margin equity security.  ¶ 19.

Meanwhile, GIS permitted its U.S. customers to purchase securities valued at 20 or 30 times the equity in its account.  ¶ 19.  This degree of margin or leverage was significantly more than the backers or traders would have been permitted to trade through a U.S. broker-dealer.  ¶ 19.  Indeed, on one occasion the margin ratio of a GIS customer account reached 167:1, meaning the customer had borrowed 167 times the value of the account.  ¶ 19.

The increased leverage available through GIS was the reason that GIS's backer and day-trader customers chose to clear their trades through GIS.  ¶ 20.  The degree of leverage GIS extended, however, created risk for the U.S.-based introducing brokers, which could face losses if one of GIS's day-trading customers abandoned a trade before it had been settled and paid for.  ¶ 20.

## V.	GIS Received Transaction-Based Compensation From Its U.S. Customers

GIS's fees were higher than comparable U.S.-registered brokerage firms.  ¶ 20.  GIS charged the U.S. backers and day traders commissions of approximately $34 to $55 per trade for

clearing and settlement services, as well as fees for other brokerage services, such as curing failed trades.  ¶ 17.  From 2016 through 2019, GIS received more than $8.5 million in commission revenue from its U.S. customers.  ¶ 18.

## VI.   Gunn Directed and Participated in GIS's Operations, Including for U.S. Customers

As GIS's founder, chairman, compliance officer and principal, Gunn directed and was involved in all aspects of GIS's operations, including its brokerage activities for U.S. customers. ¶ 23.  Among other things, Gunn onboarded new customers, opened and closed accounts, and resolved trading and leverage issues.  ¶ 23.  Gunn communicated with GIS's U.S. customers by email on a regular basis, communicated with U.S. customers regarding opening and closing accounts at GIS, and solicited their business.  ¶¶ 23, 24; Declaration of David Stoelting dated May 7, 2021 ("Decl."), Ex. 2 (emails between Gunn and U.S. customers).

Gunn also assisted the day traders in setting up the delivery versus payment accounts at the U.S. introducing brokers.  ¶ 25.  For example, Gunn, as GIS's compliance officer, signed and sent numerous "comfort letters" to the introducing brokers, several of which were located in Manhattan.  ¶ 25.  In these letters, Gunn stated:

> [GIS] acts on behalf of [the day-trading sub-account holder] as custody and settlement agent. . . . In our capacity as settlement agent for [the sub-account holder] . . . GIS will honour transactions which [the sub-account holder] ha[s] confirmed through our agreed trade clearing process[.]

¶ 25; Decl. Ex. 1 (47 comfort letters signed by Gunn).

On at least one occasion, Gunn used GIS's own capital to resolve a margin call in a U.S. backer's omnibus account—the leverage in the account had exceeded the agreed-upon limits— and sold securities from the backer's account for the same purpose.  ¶ 26.

On several occasions, Gunn travelled to the U.S., including to Manhattan, to meet with GIS customers.  ¶ 23.

## SERVICE: FACTUAL AND PROCEDURAL BACKGROUND

From 2014 through May 2021, Gunn has been a senior officer of GIS, and GIS's headquarters has been at 2nd floor, 2 London Wall Buildings, London. Each of the 47 "comfort letters" signed and sent by Gunn in 2014, 2015, 2016 and 2019 showed Gunn's address to be 2 London Wall Buildings. Decl. Ex. 1. Gunn's signature block in emails he sent in 2014, 2015, 2016 and 2018 also showed his address to be 2 London Walls Buildings. Decl. Ex. 2 at 1, 2, 7, 14. GIS's public website (https://www.gisukltd.com), accessed January 6, 2021, shows that GIS's business address is 2nd floor, 2 London Wall Buildings, London EC2M 5PP. *See* Affidavit of Service filed Jan. 7, 2021 ("Aff. Serv.") ¶ 11, Ex. 2 (Dkt. 10).

On December 22, 2020, the Commission filed its Complaint. Dkt. 1. That day, the SEC emailed to Gunn's U.S. lawyers a courtesy copy of the Complaint. Aff. Serv. ¶ 5 (Dkt. 10). Two days later, on Christmas Eve, Gunn issued a press release acknowledging the Complaint and discussing its allegations. Aff. Serv. Ex. 8 (Dkt. 10-8).

On December 29, 2020, pursuant to Federal Rule of Civil Procedure 4(f)(2)C)(ii), the SEC delivered to the Clerk's Office a letter requesting service by Federal Express of the Summons and Complaint and other documents to GIS and Gunn at 2nd floor, 2 London Wall Buildings, London. Aff. of Serv. ¶ 12, Ex. 5 (Dkt. 10-5). On December 30, 2020, the Clerk posted Certificates of Mailing certifying under penalty of perjury that copies of the service documents were served on GIS and Gunn pursuant to Rule 4(f)(2)(C)(ii). *Id.*, ¶ 13, Ex. 6 (Dkt. 10-6). On January 7, 2021, after receiving from Federal Express proofs of service with signatures, the SEC filed its Affirmation of Service. Aff. Serv. ¶ 14, Ex. 7 (Dkt. 10, Ex. 7).

**ARGUMENT**

I.    **THE COURT SHOULD DENY GUNN'S MOTION TO DISMISS UNDER RULE 12(b)(5), BECAUSE THE SEC PROPERLY SERVED GUNN.[2]**

On a motion to dismiss under Rule 12(b)(5) for insufficient service of process, a court "must look to matters outside the complaint to determine whether it has jurisdiction." *Mende v. Milestone Tech., Inc.*, 269 F. Supp. 2d 246, 251 (S.D.N.Y. 2003). The plaintiff bears the burden of proving adequacy of service. *Id.* (citation omitted).

The SEC properly served Gunn under Rule 4(f)(2)C)(ii), which permits service on persons located in a foreign country using "any form of mail that the clerk addresses and sends to the individual and that requires a signed receipt," under certain conditions described below. Fed. R. Civ. P. 4(f)(2)(C)(ii); *see also Ackermann v. Levine*, 788 F.2d 830, 839 (2d Cir. 1986) (upholding mail service on foreign defendants); *In re Coudert Brothers LLP*, No. 16-cv-8237, 2017 WL 1944162, at *12 (S.D.N.Y. May 10, 2017) (Rule 4(f)(2)(C)(ii) "allows service via mail" to foreign defendants). The S.D.N.Y. Clerk's Office has established procedures for service under Rule 4(f)(2)(C)(ii), available at www.nysd.uscourts.gov/forms/foreign-mailing-instructions.

When the country in which service occurs is a signatory to the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents, Rule 4(f)(2)C)(ii) requires that the country's agreement under the Convention allow mail service, that mail service not be "prohibited by the foreign country's law," and that the mail service be "reasonably calculated to give notice." Fed. R. Civ. P. 4(f)(2); *see also Water Splash, Inc. v. Menon*, 137 S. Ct. 1504, 1513 (2017) ("[I]n cases governed by the Hague Service Convention, service by mail is

---

[2] GIS has not moved to dismiss based on insufficient service, although the SEC served GIS and Gunn in the identical manner.

permissible if two conditions are met: first, the receiving state has not objected to service by mail; and second, service by mail is authorized under otherwise-applicable law.").  Because the SEC served Gunn under that provision and has met all conditions, service on Gunn was proper.

*First*, as described above, the SEC's Affidavit of Service (Dkt. 10), establishes that the SEC served Gunn (and GIS) by having the Clerk of the Court mail the Summons and Complaint to Gunn by Federal Express to GIS's address at 2 London Walls Buildings in London and by obtaining a delivery signature.  Service via Federal Express to a foreign defendant's place of business is appropriate under Rule 4(f)(2)(C)(ii).  *See, e.g., Evriholder Products LLC v. Simply LBS Ltd., No.,* 17-cv-4329*,* 2020 WL 7060336, at *3 (S.D.N.Y. Apr. 21, 2020) (defendant served by having Clerk of Court send the Summons and Complaint to defendant's business in Hong Kong via Federal Express); *Polagrid LLC v. Videsh Sanchar Nigam Limited*, No. 04-cv-9578, 2006 WL 903184, at *2 (S.D.N.Y. Apr. 7, 2006) (Clerk of Court's mailing via Federal Express of Summons and Complaint to defendant's office in India was "undoubtedly sufficient" under Rule 4(f)(2)(C)(ii)).

*Second*, the U.K., a Hague Convention signatory, has not objected to the Convention's provision permitting mail service.  Article 10(a) of the Hague Convention provides that the Convention "shall not interfere with [ ] the freedom to send judicial documents, by postal channels, to persons abroad," and the U.K. has *not* objected to Article 10(a). *See Table Reflecting Applicability of Articles 8(2), 10(a)(a) and (c), 15(2) and 16(3) of the Hague Service Convention*, https://www.hcch.net/en/instruments/conventions/specialisedsections/service. *See also Chambers v. Knight*, No. 18-cv-2906-BAS, 2019 WL 1923936, at *5 (S.D. Cal. Apr. 30, 2019) ("The United Kingdom has not objected to Article 10(a) and thus service may be effectuated on a defendant in the United Kingdom by mail.").

*Third*, U.K. law permits service by mail. *Wong v. Partygaming Ltd.*, No. 06-cv-2376, 2008 WL 1995369, at *3 (N.D. Ohio May 6, 2008) ("[A] complaint mailed to the United Kingdom ̇complie[s] with both the Hague Convention and the law of the United Kingdom.'") (citation omitted); *Chambers*, 2019 WL 1923936, at *5.

*Fourth*, service to GIS's headquarters, the company the Gunn founded and has run up to the present, was not only "reasonably calculated to give notice," Fed. R. Civ. P. 4(f)(2)C)(ii), but did give Gunn notice. Gunn, in fact, does ***not*** deny that he received the copies of the Summons and Complaint that were delivered to GIS's London office on January 6, 2021.

Gunn nevertheless argues that service on him was "defective" for various reasons, all without merit. Gunn first argues that service under Rule 4(f)(2)(C)(ii) was improper because the law of the United Kingdom "does not contemplate service on an individual by mail." Defs. Br. at 7.[3] Gunn is incorrect: service by mail is permitted in the U.K. *Brockmeyer v. May*, 383 F.3d 798, 803 (9th Cir. 2004) ("The State Department circular tailored to the United Kingdom specifies that mail service by international registered mail is allowed.").

Gunn's next argues that his "actual place of business" is not London but Hong Kong. Defs. Br. at 8. As of May 4, 2021, however, GIS's web site identifies Gunn as "Chairman and Founder" of GIS U.K., and lists his GIS U.K. email. Decl. Ex. 3. Gunn's declaration, executed April 1, 2021, states that Gunn is currently "Chairman, Compliance Officer, and Founder of GIS"; that he "chair[s] meetings of the company's board of directors and some of its board sub-committees"; is "responsible for communications with GIS's shareholders and for leading strategic projects [for GIS]; and that he is also "responsible for monitoring the compliance

---

[3] "Defs. Br." refers to the Memorandum of Law in Support of Global Investment Strategy U.K. Ltd. and John William Gunn's Motion to Dismiss the Complaint (Dkt. 19).

function of the firm and ensuring that adequate policies are in place." Declaration of John William Gunn dated Apr. 1, 2021 ("Gunn Decl."), ¶ 7 (Dkt. 20). All of GIS's executive and control functions are in London and all of its employees are based in London. Gunn Decl. ¶ 8. Given Gunn's own admission that he continues to maintain a substantial leadership role and responsibilities at GIS, service to GIS's London office was reasonably calculated to provide him notice of this action.

Gunn cites to two cases but neither supports his position. Defs. Br. at 8. In the first case, *BRF S.A. Securities Litigation*, the court stated that "[s]ervice of process made at a defendant's place of employment can be consistent with due process." 18-cv-2213 (PKC), 2019 WL 257971, at *7 (S.D.N.Y. Jan. 18, 2019) (citations omitted). And in contrast to *BRF*, where the court found the evidence of defendant's places of business to be "solely a product of unspecified online research," the record of Gunn's place of business in London is substantial and persuasive. Accordingly, delivery of the summons and Complaint to GIS's London address was reasonably calculated to give notice to Gunn

Gunn also cites to *TAGC Mgt., LLC v. Lehman*, 842 F. Supp.2d 575 (S.D.N.Y. 2012), a case that is inapposite because it concerns service on a person in the U.S. under Rule 4(e), not on a person outside the U.S. under Rule 4(f). *Id.* at 582. In any event, *TAGC* undermines Gunn's argument because it makes clear that "[f]or the purpose of service of process, a defendant can have more than one 'actual place of business," and that a plaintiff is entitled to serve a defendant at any place of business that the individual "held out . . . to be their actual place of business by receiving business mail there, advertising it to be their actual place of business, or any other action that may have induced plaintiff's reliance." *Id*. at 582-583. As shown by his own emails,

letters and GIS's website, Gunn has continuously held out London, not Hong Kong, as his place of business.

Finally, Gunn states that no case under Rule 4(f)(2)(C)(ii) has approved service by mail at an individual's place of business. Defs. Br. at 7. This is incorrect. *See SignalQuest, Inc. Tien-Ming Chou*, 284 F.R.D. 45, 47-50 (D.N.H. 2012) (finding that service by Federal Express on the company and its CEO at the company headquarters in Taiwan was "reasonably calculated to give defendants notice of this action and did, in fact, provide them such notice" and denying Rule 12(b)(5) motion for insufficient service of process).[4]

## II. THE COURT SHOULD DENY GUNN'S RULE 12(b)(2) MOTION TO DISMISS BECAUSE THE COURT HAS PERSONAL JURISDICTION OVER HIM.

### A. Standard of Review

"Prior to discovery, a plaintiff challenged by a jurisdiction testing motion may defeat the motion by pleading in good faith…legally sufficient allegations of jurisdiction, *i.e.*, by making a *prima facie* showing of jurisdiction." *Jazini v. Nissan Motor Co.,* 148 F.3d 181, 184 (2d Cir. 1998) (citations and internal quotation marks omitted). On a Rule 12(b)(2) motion, the court may look beyond the four corners of the complaint and consider materials outside of the pleadings, including accompanying affidavits, declarations, and other written materials. *See Jonas v. Estate of Leven*, 116 F. Supp. 3d 314, 323 (S.D.N.Y. 2015) (citing *MacDermid, Inc. v. Deiter*, 702 F.3d 725, 727 (2d Cir. 2012)). "In evaluating whether the requisite showing has

---

[4] The SEC's evidence demonstrates that the SEC has met its burden to prove that the requirements of service under Rule 4(f)(2)(C)(ii) have been satisfied. Nevertheless, if the court credits Gunn's claim in his declaration that GIS's London office was not his actual place of business as early as January 2021, then the SEC respectfully requests an evidentiary hearing on the issue of Gunn's place of business. *See Rosquist v. New York Univ. Med. Ctr.*, No. 97 Civ. 8566 (JGK), 1998 WL 702295, at *15 & n.4 (S.D.N.Y.) (referring a Rule 12(b)(5) motion to a magistrate judge for an evidentiary hearing and noting that "[d]efense counsel should consider accepting service on the defendants' behalf").

been made," a court must "construe the pleadings and any supporting materials in the light most favorable" to the plaintiff. *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 167 (2d Cir. 2013). "In deciding [a] pretrial motion to dismiss for lack of personal jurisdiction, the court has considerable discretion." *Landry v. Price Waterhouse Chartered Accountants,* 715 F.Supp. 98, 100 (S.D.N.Y.1989).

### B.    The Court Has Personal Jurisdiction Over Gunn.

The federal securities laws "permit[] the exercise of personal jurisdiction to the limit of the Due Process Clause of the Fifth Amendment." *SEC v. Unifund SAL*, 910 F.2d 1028, 1033 (2d Cir. 1990). "Those standards permit the exercise of jurisdiction over a defendant whose 'conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there.'… One circumstance making such anticipation reasonable is where a defendant has acted in such a way as to have 'caused consequences' in the forum state." *Id.* (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)). For purposes of the federal securities laws, the "forum state" is the United States, not a particular state. *See SEC v. Softpoint, Inc.*, No. 95-cv-2951, 2001 WL 43611, at *5 (S.D.N.Y. Jan. 18, 2001) ("[T]he relevant 'minimum contacts' (those that determine whether the United States may adjudicate the defendant's rights) should be the defendant's contacts with the United States, and not his contacts with the State of New York.").

"The due process test for personal jurisdiction has two related components: the 'minimum contacts inquiry' and the 'reasonableness' inquiry. The [c]ourt must first determine whether the defendant has sufficient contacts with the forum state to justify the court's exercise of personal jurisdiction." *SEC v. Straub,* 921 F. Supp. 2d 244, 252 (S.D.N.Y. 2013) (quoting *Metro. Life Ins. Co. v. Robertson–Ceco Corp.,* 84 F.3d 560, 567 (2d Cir. 1996)); *see also*

*Softpoint,* 2001 WL 43611, at *2, 5.  If the court finds "minimal contacts" with the U.S., then the court may exercise personal jurisdiction over the defendant as long as it is reasonable to do so. *Softpoint*, 2001 WL 43611, at *2.  The reasonableness inquiry is a "largely academic" inquiry in cases brought under the federal securities laws and a ground on which "few [courts] (and none in this Circuit) have ever declined jurisdiction."  *Softpoint,* 2001 WL 43611, at *5; *see also Straub*, 921 F. Supp. 2d at 259 (citing additional cases).  Presumably for this reason, Gunn does not address the reasonableness inquiry.  Defs. Br. at 9-13.

The Complaint alleges, and the additional evidence the SEC has submitted demonstrates, Gunn's more than "minimal contacts" with the U.S., including that he "directed and was involved in all aspects of GIS's operations, including its brokerage activities for U.S. customers."  Compl. ¶ 23.  Among other things:

- Gunn "travelled to the United States, including to Manhattan, on a number of occasions to meet with GIS customers," Compl. ¶ 23; *see also* Decl. Ex. 2 at 2, 12-13 (Gunn emails re visits with U.S. customers);

- Gunn solicited business from U.S. customers, Decl. Ex 2 at 2 (Gunn email to U.S. customer: "I am very happy to discuss our services with you further.");

- "Gunn communicated with the [U.S.] backers and sub-account traders regarding opening and closing accounts at GIS," Compl. ¶ 24; *see also* Decl. Ex. 2 at 5, 10 (Gunn emails re U.S. customer account openings);

- Gunn "assisted the day traders in setting up the delivery versus payment accounts at the U.S. introducing brokers," Compl. ¶ 25;

- Gunn sent "comfort letters" to U.S. introducing brokers as their settlement agent, Compl. ¶ 25; Decl. Ex. 1 (47 comfort letters signed by Gunn); and

- On one occasion, Gunn used GIS capital to address margin call in a U.S. backer's omnibus account, Compl. ¶ 26; *see also* Decl. Ex. 2 at 14 (Gunn email to U.S. backer).

These allegations and documents more than suffice to demonstrate Gunn's "minimal contacts" with the United States.  *Cf. Exxon Mobil Corp. v. Schneiderman*, 316 F. Supp. 3d 679,

697 (S.D.N.Y. 2018) (even a single meeting in New York can suffice to establish personal jurisdiction under New York's long-arm jurisdiction statute depending "on the significance of the meeting to the claim and the relationship between the meeting and the wrongful act" (citations omitted)).

Gunn makes a number of scattershot arguments that ignore the Complaint's allegations. None of these arguments has any merit.

First, Gunn incorrectly argues that the Complaint "makes no specific allegation connecting Mr. Gunn to any activity in the U.S." Defs. Br. at 11. The Complaint and the supporting documents allege and show, respectively, Gunn's activities in and directed to the U.S., as described in the bullet points above.

Next, Gunn argues that the SEC seeks to assert personal jurisdiction based solely on Gunn's status as a board member. Not so, as the allegations above demonstrate. Yet, even if the allegations did allege jurisdiction on that basis, a case cited by Gunn (Defs. Br. at 9-10), *Das v. Rio Tinto PLC*, found that the plaintiffs met their burden of alleging a *prima facie* case of personal jurisdiction over the CEO of a U.K. company based solely on the defendant's role as CEO and his signature on SEC filings. 332 F. Supp. 3d 786, 800 (S.D.N.Y. 2018).

Furthermore, Gunn seeks to minimize the significance of the 47 comfort letters he signed and sent to U.S. customers by claiming that they were sent "in his capacity as GIS's compliance officer." Defs. Br. at 12-13. Gunn offers no authority for his legal premise—that anything done by him "in his capacity as compliance officer" cannot establish personal jurisdiction—and the cases he cites do not support his argument. In *Henry Haining Zhang v. Kon Ki Lo*, the plaintiff failed to allege that the defendant "had any connection with New York whatsoever." No. 14-cv-6945-CM, 2020 WL 2133163, at *3 (S.D.N.Y. 2020). Similarly, in *Duravest, Inc. v. Viscardi,*

*A.G.*, 581 F. Supp. 2d 628, 636 (S.D.N.Y. 2008), the plaintiff alleged personal jurisdiction over the board chairman of a German company based on a single letter sent to all shareholders of the company, some of whom lived in New York. The court found that, since the chairman had no personal contacts with New York apart from that one letter, the exercise of personal jurisdiction over the chairman did not satisfy the due process clause.

Here, the allegations in the Complaint, along with the additional documents the SEC has submitted, allege and show that Gunn directed his activities toward the U.S. and that this litigation arises from those contacts. Accordingly, the SEC has established the minimum contacts necessary to satisfy due process.

## III. THE COURT SHOULD DENY DEFENDANTS' RULE 12(b)(6) MOTION TO DISMISS BECAUSE THE COMPLAINT STATES A CLAIM FOR RELIEF.

### A. Standard of Review

To withstand a motion to dismiss for failure to state a claim on which relief may be granted under Rule 12(b)(6), the SEC need allege only "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A court must "accept all factual allegations in the complaint as true, and draw all reasonable inferences in the plaintiff's favor." *Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 128 (2d. Cir. 2011).

### B. The Complaint Adequately Alleges That GIS Acted as a Broker.

Section 15(a) of the Exchange Act requires every broker or dealer who makes use of "any means or instrumentality of interstate commerce to effect any transactions in…any security" to register with the SEC. 15 U.S.C. § 78o(a). Section 15(a)'s registration requirement is "of the utmost importance in effecting the purposes of the [Exchange] Act" because it enables the SEC "to exercise discipline over those who may engage in the securities business and it establishes

17

necessary standards with respect to training, experience, and records." *Celsion Corp. v. Stearns Mgmt. Corp.,* 157 F.Supp.2d 942, 947 (N.D. Ill. 2001) (citing *Regional Props. v. Financial & Real Estate Consulting, Co.,* 678 F.2d 552, 562 (5th Cir. 1982)).

Section 3(a)(4) of the Exchange Act defines a "broker" as "any person engaged in the business of effecting transactions in securities for the account of others." 15 U.S.C. § 78c(a)(4)(A). Whether an entity is a broker is a facts-and-circumstances inquiry, and courts have considered a variety of actions as bringing an entity within the definition of a broker. Conduct that may render an entity a broker includes "handling customer funds and securities, participating in the order-taking or order-routing process, and extending or arranging for the extension of credit in connection with a securities transaction." *SEC v. Art Intellect, Inc.*, No. 2:11-CV-357, 2013 WL 840048, at *20 (D. Utah Mar. 6, 2013) (citing, *e.g.*, *Mass. Fin. Servs., Inc. v. Sec. Investor Protection Corp.*, 411 F.Supp. 411, 415 (D. Mass. 1976)). Other factors "indicative of being a broker" include "soliciting investors, participating in the securities business with some degree of regularity, and receiving transaction-based compensation, as opposed to a salary." *SEC v. Rabinovich & Assocs., LP*, No. 07 Civ. 10547 (GEL), 2008 WL 4937360, at *5 (S.D.N.Y. Nov. 18, 2008) (citing cases).

The Complaint alleges that GIS performed many of these functions. ¶¶ 2, 12, 15, 21, 26 (alleging that GIS handled customer funds and securities); ¶¶ 2, 12, 19, 20 (alleging that GIS extended credit in connection with securities transactions); ¶¶ 2, 12, 13, 14, 15, 16, 18, 23, 24, 25 (alleging GIS regularly participated in the U.S. securities business); ¶¶ 17-18, 20 (alleging GIS received transaction-based compensation). Indeed, the Complaint alleges that GIS performed clearing and settlement services in connection with transactions in U.S. securities issued by U.S. issuers to U.S. customers, ¶¶ 2, 12, 13, 14, 15, 16 — just as U.S. clearing brokers do. *See, e.g.,*

*Kyung Sup Ahn v. Rooney, Pace Inc.*, 624 F. Supp. 368, 369 (S.D.N.Y. 1985) ("It is customary in the case of smaller brokers…for another entity, called the 'clearing broker,' to perform the mechanical record-keeping functions relating to the clearance and settlement of various transactions in customer accounts.").

Despite these allegations, Defendants contend that the Complaint fails to state a claim under Section 15(a) because the Complaint fails to allege that GIS is a broker. Defs. Br. at 14-15. Defendants' sole argument in support of this contention is that "the act of extending credit (or providing margin) for the purpose of purchasing and carrying securities is not a broker-dealer activity." Defs. Br. at 14. GIS cites no authority for this proposition, which is at odds with the case law described above.

Instead, Defendants contend that, because U.S. lending regulations adopted by the Federal Reserve Board apparently permit entities other than broker-dealers to finance securities transactions, then GIS must be a "non-broker dealer" for purposes of the securities laws. Defs. Br. at 15 ("This language plainly empowers the [Federal Reserve Board] and *not* the SEC with authority to establish regulations governing extensions of credit secured by securities."). This argument suffers from at least two flaws. First, margin requirements and other Federal Reserve regulations do in fact apply to broker-dealers in addition to other entities. 15 U.S.C. §78(g). Second, Defendants cite no support for the proposition that the Federal Reserve's statutory authority to regulate lending restricts the SEC's statutory authority to regulate broker-dealers. *See, e.g., FTC v. Ken Roberts Co.*, 276 F.3d 583, 593 (D.C. Cir. 2001) ("Because we live in an age of overlapping and concurring regulatory jurisdiction…, a court must proceed with the utmost caution before concluding that one agency may not regulate merely because another may." (internal quotation marks and citations omitted)).

In any event, Defendants' entire argument rests on a false premise: that the Complaint alleges GIS is a broker based solely on its extension of credit for securities transactions. As described above, the Complaint alleges that GIS engaged in other substantial conduct to effect securities transactions. Taken together, these allegations more than adequately allege that GIS acted as a broker, regardless of whether extending credit for securities transactions alone renders an entity a broker.

### C. The Complaint Adequately Alleges Domestic Securities Transactions.

The Complaint alleges that GIS provided securities clearing and settlement services to more than 600 U.S. customers for trades in U.S. securities issued by U.S. entities. ¶¶ 13, 14. Nevertheless, Defendants argue that *Morrison*'s limits on extraterritorial application of the U.S. securities laws are so broad that this case—involving transactions by U.S. persons acquiring U.S. securities in the U.S.—requires dismissal. Defendants are incorrect. Because the Complaint alleges not only domestic securities transactions but also domestic conduct by the Defendants, *Morrison* does not apply.

In *Morrison*, which involved fraud allegations under Section 10(b) of the Exchange Act, the Supreme Court stated that "the focus of the Exchange Act is not upon the place where the deception originated, but upon purchases and sales of securities in the United States." 561 U.S. at 266. Accordingly, the Court concluded that Section 10(b) applies only to "transactions in securities listed on domestic exchanges, and domestic transactions in other securities." *Id*. at 267.

The Complaint alleges precisely such "domestic transactions" in securities issued by U.S. companies. "[I]n order to adequately allege the existence of a domestic transaction, it is sufficient for a plaintiff to allege facts leading to the plausible inference that . . . the purchaser

incurred irrevocable liability within the United States to take and pay for a security." *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 68 (2d Cir. 2012). The Complaint alleges that the purchase orders at issue were entered by U.S. citizens located in the U.S., which is sufficient to create a "plausible inference" that the purchaser incurred irrevocable liability in the U.S. *Id.* (irrevocable liability means a "meeting of the minds . . . [that] marks the point at which the parties obligated themselves to perform even if the formal performance of their agreement is to be after a lapse of time").

Defendants emphasize that GIS "was not a party" to the domestic securities transactions and was not involved in the initial placement or the execution of the orders. Br. at 21. On that point the SEC and GIS agree, but that does nothing to support Defendants' *Morrison* argument. The clearing and settlement process GIS carried out in London does not alter the fact that the transactions that GIS cleared were domestic. The clearing process carried out the intent of the parties but was *not* the "transaction" for *Morrison* purposes. *See Loginovskaya v. Batratchenko*, 764 F. 3d 266, 274 (2d Cir. 2014) (in determining locus of securities transaction for *Morrison* purposes, "the transactions themselves" are determinative and not "actions needed to carry out the transactions"); *In re Petrobas Securities Litigation*, 150 F. Supp. 3d 337, 341-342 (S.D.N.Y 2015) (when irrevocable liability occurred in United Kingdom, fact that transaction settled through the Depository Trust Company in New York was insufficient; "[t]he mechanics of DTC settlement are actions needed to carry out transactions, but they are not . . . 'the transactions themselves'").

Defendants do not dispute that the Complaint alleges that the transactions were "executed using U.S. registered broker-dealers" and that "the SEC has identified transactions involving U.S. securities." Br. at 20-21. As a result, these "domestic transactions" did not become

transformed into something else simply because the parties to the transactions cleared and settled through GIS in London.[5]

Indeed, none of the cases cited by the Defendants to support their *Morrison* arguments involve U.S. purchasers acquiring U.S. securities in the U.S., and these cases are therefore distinguishable. For example, *City of Pontiac Policeman's and Fireman's Retirement System v. UBS AG* involved a U.S. buyer placing an order for the purchase of foreign securities on a foreign exchange. 752 F.2d 173, 188 (2d Cir. 2014); *see also SEC v. Benger*, 934 F. Supp.2d 1008, 1011 (S.D.N.Y. 2013) (issuers were foreign companies facilitated by a broker on a foreign exchange); *Cornwell v. Credit Suisse Group*, 729 F. Supp. 2d 620 (S.D.N.Y. 2010) (U.S. residents purchased shares on Swiss exchange).

Defendants' *Morrison* argument therefore provides no basis for granting their Rule 12(b)(6) motion.

### D.    The Complaint Cannot Be Dismissed Based on Defendants' Safe-Harbor Exemption Claim Because That Is An Affirmative Defense.

Defendants argue that GIS "qualifies for the safe harbor protection under Rule 15a-6." Defs. Br. at 21-22. Because this is an affirmative defense that Defendants must plead in their Answers, however, the Complaint should not be dismissed, regardless of whether the Complaint pleads facts to refute Defendants' arguments that GIS qualified for the exemption.

Rule 15a-6, promulgated by the SEC under the Exchange Act, provides a limited, safe-harbor exemption from registration for a "foreign broker or dealer" that "[e]ffects transactions in

---

[5] Referring to the allegation in the Complaint that GIS cleared trades through an omnibus account it maintained at a U.K. custodial firm (¶ 15), the Defendants claim that "the SEC also concedes that GIS did not actually perform any clearing and settlement services." Defs. Br. at 20. The Complaint makes no such concession; instead, the Complaint alleges repeatedly that the U.S. customers cleared and settled through GIS (*see* ¶¶ 2, 16, 17, 19), and the "comfort letters" signed by Gunn represented that GIS was "custody and settlement agent" for its U.S. customers and would "honour transactions . . . through our trade clearing process." Decl. Ex. 1.

securities with or for persons that have not been solicited by the foreign broker or dealer."  15

C.F.R. § 240.15a-6(a)(1).  A defendant bears the burden of proving that this exemption applies to

its conduct to exempt it from the broker registration requirement.  *See UBS Asset Mgt. (New*

*York) Inc. v. Wood Gundy Corp.*, 914 F. Supp. 66 (S.D.N.Y. 1996) (defendant claiming

exemption from registration in the U.S. under Rule 15a–6(a)(1) "bears the burden of establishing

that an exemption applies," citing *SEC v. Ralston Purina*, 346 U.S. 119, 126 (1953)).

When a defendant has the burden of proof on an issue, then it must plead the issue as an

affirmative defense in its answer—regardless of whether it is one of the examples of affirmative

defenses listed in Federal Rule of Civil Procedure 8(c).  *United States v. Continental Illinois*

*Nat'l Bank and Trust Co. of Chicago*, 889 F.2d 1248, 1253 (2d Cir. 1989).

A plaintiff has no obligation to anticipate a defendant's affirmative defense or plead facts

refuting such a defense, and a court cannot grant a motion to dismiss on the ground that a

complaint's allegations fail to refute a defendant's anticipated affirmative defense.  *See Rosen v.*

*Brookhaven Cap. Mgmt., Co.*, 194 F. Supp. 2d 224, 227 (S.D.N.Y. 2002) ("A plaintiff's

complaint should contain allegations that support her claim, but a plaintiff has no obligation to

anticipate and refute potential affirmative defenses….  Anticipation of defenses in a complaint

was not even recognized at common law and now is merely tolerated.") (citations

omitted).  "What is relevant in opposition to a motion to dismiss is only whether the [p]laintiff

can establish a *prima facie* case."  *Chillemi v. Town of Southampton*, 943 F. Supp. 2d 365, 378

(E.D.N.Y. 2013).

In any event, the Complaint *does* allege facts refuting the availability of the exemption.

Specifically, the Complaint alleges that GIS "solicit[ed] customers for its brokerage services"

and that GIS's website constituted solicitation in the U.S.  Compl. ¶¶ 12, 22.

23

E.    **The Complaint Adequately Alleges that Gunn
      Aided and Abetted GIS's Section 15(a) Violation.**

To prevail on an aiding and abetting claim, the SEC must demonstrate: (1) a securities law violation by the primary (as opposed to the aiding and abetting) party; (2) knowledge or reckless disregard of this violation by the aider and abettor; and (3) "'substantial assistance' by the aider and abettor in the achievement of the primary violation." *SEC v. Apuzzo*, 689 F.3d 204, 211 & n.6 (2d Cir. 2012) (quoting *SEC v. DiBella*, 587 F.3d 553, 566 (2d Cir. 2009)); 15 U.S.C. § 78t(e).  "[A] high degree of substantial assistance may lessen the SEC's burden in proving scienter." *Apuzzo*, 689 F.2d at 215; *see also SEC v. Wey*, 246 F. Supp. 3d 894, 928-29 (S.D.N.Y. 2017) ("[T]he SEC's scienter [pleading] burden is lessened significantly because the complaint is replete with allegations describing [one defendant]'s participation in almost every stage of the scheme…. [and his] alleged conduct was critical to the [scheme's] success.").

Gunn does not challenge the Complaint's allegations as to substantial assistance but contends that the Complaint does not allege his scienter. Br. at 23-24.  In doing so, Gunn seeks to have the court apply an incorrect scienter standard in two ways.

*First*, Gunn incorrectly contends that the SEC must plead that he had "actual knowledge" of GIS's violation, not merely reckless disregard.  *Id.*  Defendants point out that "[t]he SEC did not allege that Mr. Gunn 'recklessly' provided substantial assistance, an option [Section 20(e) of the Exchange Act] permits."   Defs. Br. at 24 n.16.  The SEC recognizes that the legal "Claim for Relief" section of the Complaint (¶ 31) alleges only that "Gunn knowingly provided substantial assistance" rather than that he did so "knowingly or recklessly."   This was an inadvertent error.  The "Violations" section of the Complaint (¶ 5) does correctly allege that Gunn aided and abetted GIS's violations "pursuant to Section 20(e) of the Exchange Act," and that statute, as

Defendants correctly point out, permits the SEC to prove an aider and abettor's scienter through "knowing[ ] or reckless[ ]" conduct.  15 U.S.C. § 78t(e).

Because a plaintiff need not plead a legal cause of action correctly or at all to withstand a motion to dismiss, as long as the factual allegations suffice to state a claim on which relief may be granted, the SEC's Complaint should withstand a motion to dismiss if it properly pleads facts demonstrating Gunn's knowing or reckless conduct.  *See, e.g., Oneida Indian Nation of N.Y. v. County of Oneida*, 617 F.3d 114, 139 (2d Cir. 2010) ("As this Court has previously indicated, the essence of a cause of action is found in the facts alleged and proven by the plaintiff, not the particular legal theories articulated."); *Hack v. President & Fellows of Yale Coll.*, 237 F.3d 81, 89 (2d Cir. 2000) ("[W]e may not affirm the dismissal of [a] complaint because [the plaintiff] ha[s] proceeded under the wrong theory 'so long as [he has] alleged facts sufficient to support a meritorious legal claim.'" (quoting *Northrop v. Hoffman of Simsbury, Inc.*, 134 F.3d 41, 46 (2d Cir.1997))), *abrogated on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002); *see also* Fed. R. Civ. P.  8(e)(1), 8(f).

*Second*, Gunn incorrectly argues that the SEC must allege that he "knew GIS was violating Section 15(a) of the Exchange Act."  Defs. Br. at 24.  "To establish knowledge, the SEC must show a 'defendant's general awareness of [his] overall role in the primary violator's illegal scheme.'"  *SEC v. Paulson*, No. 18 Civ. 6718 (PGG), 2020 WL 6263180, at *14 (S.D.N.Y. Oct. 23, 2020) (citations omitted).  The scienter requirement for aiding and abetting a regulatory violation "means awareness of the underlying facts, not the labels that the law places on those facts."  *SEC v. Falstaff Brewing Corp.*, 629 F.2d 62, 77 (D.C. Cir. 1980) ("Except in very rare instances, no area of the law not even the criminal law demands that a defendant have

thought his actions were illegal.  A knowledge of what one is doing and the consequences of those actions suffices.").

Under the correct scienter standard, the Complaint sufficiently alleges that Gunn had the requisite scienter:  he was aware of GIS's clearance and settlement activities as to U.S. customers and he was aware that GIS was not registered with the SEC.  Compl. ¶¶ 2, 10, 11, 23, 25, Decl. Ex. 1 (47 comfort letters signed by Gunn).  Indeed, the Complaint alleges that as GIS's founder, chairman, compliance officer and principal, Gunn directed and was involved in all aspects of GIS's operations, including its brokerage activities for U.S. customers.  Compl. ¶¶ 23. Accordingly, the Complaint should not be dismissed for failure to state an aiding-and-abetting claim against Gunn.[6]

---

[6]     If the Court nevertheless grants the Defendants' motion to dismiss under Rule 12(b)(6), the SEC respectfully requests that the Court grant the SEC leave to replead.  "It is the usual practice upon granting a motion to dismiss to allow leave to replead."  *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991); *see also* Fed. R. Civ. P. 15(a) ("The court should freely give leave [to amend] when justice so requires.").

## <u>CONCLUSION</u>

For the foregoing reasons, the Defendants' motion to dismiss should be denied.


Dated: New York, New York
      May 7, 2021

                                        Respectfully submitted,


                                        By:      <u>/s/ *David Stoelting*</u>
                                                  David Stoelting
                                                  *Attorney for Plaintiff*
                                                  Securities and Exchange Commission
                                                  New York Regional Office
                                                  200 Vesey Street, Suite 400
                                                  New York, NY 10281-1022
                                                  Tel: (212) 336-0174 (Stoelting)
                                                  Email: stoeltingd@sec.gov


<u>Of Counsel</u>
James E. Burt IV
(not admitted in S.D.N.Y.)