UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

- against -

GLOBAL INVESTMENT STRATEGY UK LTD.,

and

JOHN WILLIAM GUNN,

Defendants.

Case No. 20-cv-10838 (AKH)

## REPLY MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' MOTION TO DISMISS THE COMPLAINT

**DLA PIPER LLP (US)**
Caryn Schechtman
Thomas Alford
Joshua Kane
1251 Avenue of the Americas
New York, New York 10020
Phone: (212) 335-4500
caryn.schechtman@us.dlapiper.com
thomas.alford@us.dlapiper.com
joshua.kane@us.dlapiper.com

*Counsel for Defendants*
*Global Investment Strategy U.K. Ltd. and*
*John William Gunn*

# TABLE OF CONTENTS

**Page(s)**

PRELIMINARY STATEMENT ...................................................................................................1

I.    THE COMPLAINT SHOULD BE DISMISSED AS AGAINST
MR. GUNN PURSUANT TO RULE 12(b)(5), BECAUSE HE WAS NOT
PROPERLY SERVED ...................................................................................................3

     A.    Mailing the Summons and Complaint to Mr. Gunn's Alleged
Place of Business in London Was Inconsistent With U.K. Law .............................3

     B.    Mailing the Summons and Complaint to the Office of GIS in
London Was Not Reasonably Calculated to Notify, and Did Not Notify,
Mr. Gunn of this Lawsuit.......................................................................................5

II.    THE COMPLAINT SHOULD BE DISMISSED AS AGAINST MR. GUNN
PURSUANT TO RULE 12(b)(2), BECAUSE THE COURT LACKS PERSONAL
JURISDICTION OVER HIM.......................................................................................6

III.    THE COMPLAINT FAILS TO STATE CLAIMS FOR RELIEF ..................................9

     A.    The SEC Insufficiently Alleges Broker-Dealer Activities to Establish
a Violation of Section 15(a)....................................................................................9

     B.    The SEC Agrees and Admits that GIS "Was Not a Party" to the Domestic
Securities Transactions and Was Not Involved in The Initial Placement or
Execution of Any Securities Orders .....................................................................14

     C.    The SEC Admits the Inclusion of "Knowingly" in the Complaint Was an
"Inadvertent Error" and Now Seeks to Pursue Aiding and Abetting Under a
Recklessness Theory.............................................................................................16

CONCLUSION.....................................................................................................................19

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arco Capital Corps. Ltd. v. Deutsche Bank AG*,
  949 F. Supp. 2d 532 (S.D.N.Y. 2013), 2012 WL 3526621, at *8 (S.D.N.Y.
  Aug. 15, 2012)))................................................................................................................16

*Brockmeyer v. May*,
  383 F.3d 798 (9th Cir. 2004) ............................................................................................4

*Chambers v. Knight*,
  No. 18 Civ. 2906 (BAS) (BGS), 2019 WL 1923936 (S.D. Cal. Apr. 30, 2019) ......................4

*Found. Ventures, LLC v. F2G, Ltd.*,
  No. 08 Civ. 10066 (PKL), 2010 WL 3187294 (S.D.N.Y. Aug. 11, 2010) ............................11

*Friedl v. City of New York*,
  210 F.3d 79 (2d Cir. 2000)................................................................................................18

*Hack v. President & Fellows of Yale College*,
  237 F. 3d 81 (2d Cir. 2000)..............................................................................................18

*Loginovskaya v. Batatchenko*,
  764 F.3d 266 (2d Cir. 2014)..............................................................................................15

*Miller Inv. Tr. v. Xiangchi Chen*,
  967 F. Supp. 2d 686 (S.D.N.Y. 2013)................................................................................9

*Morrison v. Nat'l Austl. Bank Ltd.*,
  561 U.S. 247 (2010).............................................................................................. *passim*

*Oneida Indian Nation of N.Y. v. County of Oneida*,
  617 F.3d 114 (2d Cir. 2010)..............................................................................................18

*Rosquist v. New York Univ. Med. Ctr.*,
  No. 97 Civ. 8566 (JGK), 1998 WL 702295 (S.D.N.Y. Oct. 7, 1998) ......................................6

*Schatzki v. Weiser Capital Mgmt., LLC*,
  No. 10 Civ. 4685 (RWS), 2016 WL 6662264 (S.D.N.Y. Nov. 9, 2016)................................11

*SEC v. Art Intellect, Inc.*,
  No. 11 Civ. 357, 2013 WL 840048 (D. Utah Mar. 6, 2013)....................................................12

*SEC v. Battoo*,
  158 F. Supp. 3d 676 (N.D. Ill. 2016) ................................................................................16

*SEC v. Benger*,
    697 F. Supp. 2d 932 (N.D. Ill. 2010) ......................................................................11

*SEC v. Berger*,
    322 F.3d 187 (2d Cir. 2003)..................................................................................15

*SEC v. CKB168 Holdings, Ltd.*,
    210 F. Supp. 3d 421 (E.D.N.Y. 2016) ...................................................................11

*SEC v. Collyard*,
    154 F. Supp. 3d 781 (D. Minn 2015) (vacated in part on other grounds)................13

*SEC v. Espuelas*,
    579 F. Supp. 2d 461 (S.D.N.Y. 2008)...............................................................17, 18

*SEC v. Hansen*,
    No. 83 Civ. 3692, 1984 WL 2413 (S.D.N.Y. Apr. 6, 1984): (1) ................10, 11, 12

*SEC v. Kramer*,
    778 F. Supp. 2d 1320 (M.D. Fla. 2011) .....................................................12, 13, 14

*SEC v. Mapp*,
    240 F. Supp. 3d 569 (E.D. Tex. 2017) ..................................................................13

*SEC v. Margolin*,
    No. 92 Civ. 6307 (PKL), 1992 WL 279735 (S.D.N.Y. Sept. 30, 1992)..................10

*SEC v. Martino*,
    255 F. Supp. 2d 268 (S.D.N.Y. 2003), *aff'd*, 94 F. App'x 871 (2d Cir. 2004)...................9, 11

*SEC v. Packer, Wilbur & Co.*,
    362 F. Supp. 510 (S.D.N.Y. 1973) ......................................................................10

*SEC v. Paulsen*,
    No. 18 Civ. 6718 (PGG), 2020 WL 6263180 (S.D.N.Y. Oct. 23, 2020)................17

*SEC v. Rabinovich & Assoc., LP*,
    No. 07 Civ. 10547 (GEL), 2008 WL 4937360 (S.D.N.Y. Nov. 18, 2008)............14

*SEC v. Sharef*,
    924 F. Supp. 2d 539 (S.D.N.Y. 2013).....................................................................6

*SEC v. StratoComm Corp.*,
    2 F. Supp. 3d 240 (N.D.N.Y. 2014).......................................................................11

*SEC v. Tuzman*,
    No. 15 Civ. 7057 (AJN), 2017 WL 11606728 (S.D.N.Y. Sept. 29, 2017).............17

*Walden v. Fiore*,
    571 U.S. 277 (2014)................................................................................................6, 8

*Water Splash, Inc. v. Menon*,
    137 S. Ct. 1504 (2017)................................................................................................5

*Wong v. Partygaming Ltd.*,
    No. 16 Civ. 2376, 2008 WL 1995369 (N.D. Ohio May 6, 2008)...............................4

*In re Worldcom, Inc. Sec. Litig.*,
    308 F. Supp. 2d 214 (S.D.N.Y. 2004) (vacated on other grounds).........................18

**Statutes**

15 U.S.C. § 78c(a)(4) ......................................................................................................9

**Other Authorities**

12 C.F.R. § 224 ............................................................................................................10

Fed. R. Civ. P. 4(l)(2)(B) ................................................................................................6

Fed. R. Civ. P. 4(f)(2)(C)(ii) ..................................................................................3, 5, 6

Fed. R. Civ. P. 12(b)(2), 12(b)(5), and 12(b)(6) ...........................................................1

Defendants Global Investment Strategy U.K. Ltd. ("GIS") and John William Gunn ("Mr. Gunn"), by and through their undersigned attorneys and pursuant to Federal Rules of Civil Procedure 12(b)(2), 12(b)(5), and 12(b)(6), respectfully submit this reply memorandum of law in support of their motion to dismiss Plaintiff Securities and Exchange Commission's ("SEC") Complaint for lack of personal jurisdiction and insufficient service of process as to Mr. Gunn, and failure to state claims upon which relief can be granted as to both Mr. Gunn and GIS.[1]

## PRELIMINARY STATEMENT

This case is a strained attempt by the SEC to classify a foreign entity as a U.S. broker-dealer subject to the registration requirements of Section 15(a) of the Exchange Act. The attempt fails for two principal reasons. First, GIS is not alleged to have engaged in any of the activities traditionally associated with broker-dealers. The Complaint does not allege that GIS received orders for securities, negotiated the terms of any securities transaction, executed any securities transaction, rendered advice about securities, received commissions for executing securities transactions, made valuations as to the merits of a given investment, or actively solicited investors. Second, GIS—a company registered and domiciled in the United Kingdom—was not party to any U.S.-based transaction, which means that under *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247 (2010), Section 15(a) does not apply to its activities even if they were brokerage activities, which they were not.

The Complaint's fatal defects are glaring in the SEC's opposition to Defendants' motion. The SEC fails to produce a single case in which a company is classified as a broker-dealer because it extended margin to its customers, which is the alleged activity by GIS on which the Complaint is based. And the SEC concedes that GIS was not a party to any alleged domestic securities

---

[1]     Unless otherwise defined, capitalized terms have the same meaning as in Defendants' moving brief dated April 2, 2021 ("Moving Br.") [ECF No. 19].

transaction and was not involved in the placement or execution of any security issued in the U.S. All the alleged activity by GIS—extending margin and maintaining a custodial account with a different company in the U.K. where transactions were allegedly cleared and settled—was admittedly extraterritorial, foreclosing the application of Section 15(a) under *Morrison*. To get around this problem, the SEC simply asserts that the only relevant aspects of the alleged transactions are those that took place in the United States, *i.e.*, the aspects with which GIS had no involvement. The SEC does not explain how its position is any different from the "conduct and effects" test that *Morrison* displaced.

The rest of the SEC's opposition fares no better. On its aiding and abetting claim against Mr. Gunn, the SEC attempts to show actual knowledge of GIS's alleged violation of Section 15(a) simply by referencing Mr. Gunn's position at GIS, which hardly suffices. The SEC attempts to establish a basis for personal jurisdiction over Mr. Gunn, a U.K. citizen who resides outside the United States, by pointing to form letters and emails that mostly reflect no direct connection to the activity GIS is alleged to have undertaken and in any event reflect no personal action by Mr. Gunn connecting him to the United States. And the SEC continues to assert that it properly served Mr. Gunn, despite having mailed the summons and complaint to a place where Mr. Gunn does not live or work. As Mr. Gunn confirms in his reply declaration, he did not in fact receive that mailing.

In short, the SEC has failed to state a claim against either Defendant upon which relief can be granted, it has not established that this Court has personal jurisdiction over Mr. Gunn, and it has not properly served Mr. Gunn. Accordingly, the Complaint should be dismissed as against Mr. Gunn pursuant to Rules 12(b)(2) and 12(b)(5) and against both Defendants pursuant to Rule 12(b)(6).

**ARGUMENT**

## I. THE COMPLAINT SHOULD BE DISMISSED AS AGAINST MR. GUNN PURSUANT TO RULE 12(B)(5), BECAUSE HE WAS NOT PROPERLY SERVED.

Mr. Gunn resides outside the United Kingdom and is employed by a Hong Kong-registered company. (Gunn Decl., ¶¶ 3, 9, 10.)[2] The SEC nevertheless purports to have served him by mailing the summons and complaint to the office of GIS, a U.K. company, in London. (*See* Affidavit of Service, ¶ 12 & Ex. 5.)[3] The SEC relies on Rule 4(f)(2)(C)(ii) of the Federal Rules of Civil Procedure, which permits service by mail to defendants located abroad, subject to certain conditions. Among the Rule's other requirements, service by mail must "not be prohibited by the foreign country's law," and it must be "reasonably calculated to give notice" to the defendant. The SEC's service attempt is deficient in both respects, and each defect alone warrants dismissal.

### A. Mailing the Summons and Complaint to Mr. Gunn's Alleged Place of Business in London Was Inconsistent With U.K. Law.

The SEC says that it directed service to the office of GIS in London because it believed that office was Mr. Gunn's "business address." (Affidavit of Service, ¶ 11.) But as we noted in Defendants' moving brief, Rule 6.9 of the English Civil Procedure Rules ("CPR") provides that the place of service on a natural person is that person's "usual or last known residence." (Moving Br., p. 7.) As a result, service by mail to Mr. Gunn's alleged place of business is improper under U.K. law and is therefore improper under Rule 4(f)(2)(C)(ii), which permits mail service only if "not prohibited by the foreign country's law." For this reason alone, the complaint should be dismissed pursuant to Rule 12(b)(5).

---

[2]    References to "Gunn Decl." are to the Declaration of John William Gunn dated April 1, 2021 in support of Defendants' Motion to Dismiss [ECF No. 20].

[3]    References to "Affidavit of Service" are to the affidavit of service by David Stoelting dated January 7, 2021 [ECF No. 10].

In its opposition, the SEC avoids any mention of CPR 6.9, tacitly accepting that mailing the complaint to a person's place of business is inconsistent with U.K. law. The SEC focuses instead on the fact that when ratifying the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents (the "Hague Service Convention"), the U.K. did not object to the Convention's Article 10(a), which provides that the Convention "shall not interfere with the freedom to send judicial documents, by postal channels, directly to persons abroad." (Opp. Br., p. 10.) The U.K.'s acceptance of Article 10(a) is also the basis for the cases the SEC cites (all out of Circuit) to argue that mail service is appropriate. *See Chambers v. Knight*, No. 18 Civ. 2906 (BAS) (BGS), 2019 WL 1923936, at *5 (S.D. Cal. Apr. 30, 2019) (referring to Article 10(a)); *Wong v. Partygaming Ltd.*, No. 16 Civ. 2376, 2008 WL 1995369, at *3 (N.D. Ohio May 6, 2008) (same); *Brockmeyer v. May*, 383 F.3d 798, 803 (9th Cir. 2004) (same). None of these cases addresses the issue whether mailing service to a person's place of business, as opposed to that person's residence, is proper under U.K. law.

At most, the U.K.'s acceptance of Article 10(a) suggests that it *generally* permits international service on U.K.-based defendants by mail. It does not follow that the U.K. agreed specifically to allow international service by mail to defendants' places of business. That would mean that in ratifying the Hague Service Convention, the U.K. implicitly chose to give plaintiffs in foreign proceedings more options for service than are available to its own citizens in domestic proceedings. The SEC provides no support for such an implausible theory.

The SEC's position also cuts against the language of Article 10(a), which refers to sending judicial documents "*directly* to persons abroad." Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, Art. 10(a), Nov. 15, 1965, 20 U.S.T.

361, 658 U.N.T.S. 163 (emphasis added).[4]  The Supreme Court has suggested that this language contemplates exactly what it says—mailing service directly to the defendant, without going through an intermediary.  *See Water Splash, Inc. v. Menon*, 137 S. Ct. 1504, 1510 & n.3 (2017) (recognizing that a "plausible explanation for the distinct terminology of Article 10(a) is that it is the only provision in the Convention that specifically contemplates direct service, without the use of an intermediary").  Here, by contrast, the SEC seems to have intended that the front-desk clerk of an office building in London would forward the summons and complaint to Mr. Gunn, who lives and works elsewhere.  (*See* Opp. Br., p. 11.)  That is inconsistent with the plain language of Article 10(a).

**B.      Mailing the Summons and Complaint to the Office of GIS in London Was Not Reasonably Calculated to Notify, and Did Not Notify, Mr. Gunn of this Lawsuit.**

In Defendants' moving brief, we explained that the generic and/or outdated information in the SEC's affidavit of service did not support the SEC's assumption that Mr. Gunn's business address was the same as GIS's London address.  (*See* Moving Br., p. 8.)  And Mr. Gunn submitted a declaration in which he testified that, in fact, GIS's London address is *not* his business address.  Mr. Gunn confirmed that since at least 2019 he has been working from the Hong Kong office of GIS HK Ltd., his employer, or otherwise remotely.  (Gunn Decl., ¶¶ 3, 9-10.)  As a result, mailing the summons and complaint to GIS in London was not reasonably calculated to notify Mr. Gunn of this lawsuit, as Rule 4(f)(2)(C)(ii) requires.

In response to Mr. Gunn's testimony, the SEC doubles down on its insistence that London is his place of business but offers no new facts to support that claim—only self-serving

---

[4]        The SEC misquotes Article 10(a) by omitting the word "directly."  (*See* Opp. Br., p. 10.)

characterizations of the information it relied upon in its affidavit of service. And the SEC's reliance on Mr. Gunn's services to GIS (Opp. Br., p. 11) is unavailing. As Mr. Gunn confirms, he performs those services largely from outside London, and his role as compliance officer is for the entire group of companies of which GIS is a part. (Gunn Reply Decl., ¶ 4.)[5]

Remarkably, the SEC also asserts, without any evidence, that Mr. Gunn somehow received the summons and complaint mailed to GIS despite not having signed for those papers. (Opp. Br., p. 11.) The SEC is incorrect. As Mr. Gunn confirms in his reply declaration, he *never received* the summons or complaint sent to GIS in London. (Gunn Reply Decl., ¶ 3.) This fact, together with Mr. Gunn's earlier testimony, establishes that mailing the summons and complaint to GIS in London was not reasonably calculated to notify Mr. Gunn of this action.[6]

## II. THE COMPLAINT SHOULD BE DISMISSED AS AGAINST MR. GUNN PURSUANT TO RULE 12(B)(2), BECAUSE THE COURT LACKS PERSONAL JURISDICTION OVER HIM.

To meet its burden of establishing personal jurisdiction over Mr. Gunn, the SEC must show that he "has 'purposefully directed his activities towards the forum [*i.e.*, the United States] and [that] the litigation arises out of or is related to [his] contact with the forum.'" *SEC v. Sharef*, 924 F. Supp. 2d 539, 544-45 (S.D.N.Y. 2013). The connection between Mr. Gunn's alleged "suit-related conduct" and the U.S. must be "substantial." *Walden v. Fiore*, 571 U.S. 277, 284 (2014).

---

[5] "Gunn Reply Decl." refers to the reply declaration of John William Gunn dated May 28, 2021 and submitted with this memorandum.

[6] The SEC's request for an evidentiary hearing on Mr. Gunn's place of business is misconceived. (Opp. Br., p. 13 & n.4.) Unlike the case on which the SEC relies for that request, there is no serious dispute whether Mr. Gunn received the summons and complaint mailed to him. *Rosquist v. New York Univ. Med. Ctr.*, No. 97 Civ. 8566 (JGK), 1998 WL 702295, at *15 & n.4 (S.D.N.Y. Oct. 7, 1998). The reality is that the SEC cannot prove service. *See* Fed. R. Civ. P. 4(l)(2)(B) (requiring, for service under Rule 4(f)(2)(C)(ii), "a receipt *signed by the addressee*, or by other evidence satisfying the court that the summons and complaint were *delivered to the addressee*") (emphasis added).

As discussed in Defendants' moving brief, the SEC has not met this burden, and the complaint should be dismissed as against Mr. Gunn pursuant to Rule 12(b)(2). (*See* Moving Br., pp. 9-13.)

The heart of the SEC's complaint is that GIS acted as an unregistered U.S. broker by allegedly performing clearance and settlement services for U.S. customers and extending margin to those customers. (Compl., ¶¶ 12-20.) The SEC must therefore plead facts showing a meaningful relationship between these alleged activities—all of which would have taken place outside the United States—and Mr. Gunn's personal contacts with the United States. The SEC has not done so. Its allegations relating to Mr. Gunn are limited to (1) baselessly conflating Mr. Gunn with GIS by attributing alleged conduct by GIS to Mr. Gunn (*see* Compl., ¶¶ 23, 26); and (2) alleging a few communications between U.S.-based persons and Mr. Gunn that are at best incidental to the SEC's claims. (*See* Compl., ¶¶ 23-25.)

In its opposition, the SEC attempts to bolster its case for personal jurisdiction over Mr. Gunn by providing alleged evidence of Mr. Gunn's connections with the United States. (Opp. Br., p. 15.) The SEC's offering falls into two categories: emails from Mr. Gunn and standard-form "comfort letters" issued by GIS and bearing Mr. Gunn's signature as GIS's compliance officer. These documents make even clearer that there is no meaningful connection between the United States and any alleged suit-related activity of Mr. Gunn.

First, the emails provided by the SEC often do not match the SEC's characterizations of them. For example, the SEC cites a single email chain as alleged evidence that Mr. Gunn "solicited business from U.S. customers." (Opp. Br., p. 15 (second bullet); Opp. Decl. Ex. 2, pp. 2-4.)[7] Yet, this correspondence appears to have been initiated not by Mr. Gunn but instead by a potential customer. (*Id.*, pp. 3-4.) And while Mr. Gunn suggests possible next steps depending on whether

_____

[7] References to "Opp. Decl." are to the declaration of David Stoelting dated May 7, 2021 [ECF No. 22].

and how the potential customer wished to proceed, those next steps (to the extent they occurred) would apparently have been managed by others at GIS.  (*See id.*, p. 2.)  Similarly, in support of its allegation that Mr. Gunn "communicated with the [U.S.] backers and sub-account traders regarding opening and closing accounts at GIS," the SEC cites two brief emails that are addressed to *others at GIS*.  (Opp. Br., p. 15 (third bullet); Opp. Decl. Ex. 2, pp. 5, 10.)  And the single email cited to support the allegation that "Gunn used GIS capital to support a margin call in a U.S. backer's omnibus account" merely reflects Mr. Gunn's description of activity undertaken by GIS.  (Opp. Br., p. 15 (sixth bullet); Opp. Decl. Ex. 2, p. 14.)  It does not indicate that Gunn personally engaged in any U.S.-based action.

Apart from whether they have been accurately described, the emails submitted by the SEC do not reflect a "substantial" connection between Mr. Gunn's U.S. contacts and the allegations driving the complaint.  *Walden*, 571 U.S. at 284.  There is no evident link between the alleged clearing, settling, and lending transactions on which the complaint is focused and (i) the few emails referencing potential meetings between Mr. Gunn and customers in New York (Opp. Decl., Ex. 2, pp. 2, 12-13); (ii) the email chain alleged to be a solicitation (Opp. Decl. Ex. 2, p. 2.); (iii) the bare allegation that Mr. Gunn "assisted the day traders in setting up the delivery versus payment accounts at the U.S. introducing brokers."  (Opp. Br., p. 15.); or (iv) the emails concerning the possibility of opening accounts at GIS (Opp. Decl. Ex. 2, pp. 5, 10).  All these communications appear to relate to potential accounts or customers.  The SEC has not alleged facts or provided evidence reflecting the specific involvement of these potential accounts or customers in the alleged transactions underlying the SEC's claims.  Even had the SEC provided evidence or plausible allegations to bridge that gap, the communications would remain several steps removed from the alleged transactions at issue.  They are too attenuated to support the exercise of jurisdiction over

Mr. Gunn. And again, the one email that does appear to relate to one of the transactions alleged by the SEC reflects not personal action undertaken by Mr. Gunn, but action apparently undertaken by GIS. (Opp. Decl. Ex. 2, p. 14.)

Finally, the standard-form "comfort letters" provided by the SEC are also insufficient to support personal jurisdiction. As Mr. Gunn explains, these letters are not communications issued personally by Mr. Gunn but are standard-form letters from GIS. (Gunn Reply Decl., ¶ 5.) Moreover, the SEC alleges these letters were issued not to customers or potential customers but to introducing broker-dealers, which the SEC alleges to be an intermediary party. (Opp. Decl., ¶ 3; Compl., ¶¶ 13-14.) And because the clearing-and-settling services to which they relate would have occurred outside the United States (*see* Compl., ¶ 15), the letters are insufficient on their own to establish the jurisdiction of this Court. *See Miller Inv. Tr. v. Xiangchi Chen*, 967 F. Supp. 2d 686, 694 (S.D.N.Y. 2013) (comfort letters alone insufficient to establish personal jurisdiction over foreign defendants where defendants' services were performed outside forum state).

For these reasons, the complaint should be dismissed as against Mr. Gunn pursuant to Rule 12(b)(2).

## III.    THE COMPLAINT FAILS TO STATE CLAIMS FOR RELIEF.

### A.    The SEC Insufficiently Alleges Broker-Dealer Activities to Establish a Violation of Section 15(a).

Section 3(a)(4) of the Exchange Act defines "broker" as "any person engaged in the business of effecting transactions in securities for the account of others." 15 U.S.C. § 78c(a)(4). In determining whether a particular individual or entity falls within this definition, "courts consider whether the individual may be characterized by a certain regularity of participation in securities transactions at key points in the chain of distribution." *SEC v. Martino*, 255 F. Supp. 2d 268, 283 (S.D.N.Y. 2003) (internal quotation marks omitted), *aff'd*, 94 F. App'x 871 (2d Cir. 2004). In the

Complaint, the SEC has failed to adequately allege that GIS was regularly participating in securities transactions at key points in the chain of distribution.

The SEC does not allege that GIS receives orders for securities, negotiates the terms of any securities transaction, or executes any securities transaction. Nor does the SEC allege that GIS renders advice about securities, receives commissions for executing securities transactions, or makes valuations as to the merits of a given investment. Moreover, since GIS has no control over the accounts of its U.S. customers, it is only even aware of the existence of a securities transaction once the trade has already been accomplished. Not having engaged in these traditional broker activities, GIS was not required to register as a broker under Section 15 of the Exchange Act.

The limited activity GIS in which GIS is alleged to have engaged—extending credit for the purpose of purchasing and carrying securities, and holding customer funds and securities—is not that of a broker-dealer and therefore cannot serve as a basis for a violation of Section 15(a).[8] Of the cases from this Circuit analyzing what constitutes broker activity, none states that extending margin renders one a broker, or that such activity amounts to "effecting" or "attempting to induce" a securities transaction.[9] These cases instead focus on the activities identified in *SEC v. Hansen*, No. 83 Civ. 3692, 1984 WL 2413 (S.D.N.Y. Apr. 6, 1984): (1) being an employee of an issuer;

---

[8]  The SEC's observation that margin requirements and other Federal reserve regulations can apply to broker-dealers misses the point. (*See* Opp. Br., p. 19 (citing 15 U.S.C. § 78(g))). The SEC has not shown that the mere act of extending credit to purchase and carry securities brings one within the ambit of the Exchange Act or transforms a lender into a broker-dealer. And, even if GIS was a qualifying broker-dealer, Regulation X, 12 C.F.R. § 224, provides that *the investor* may not obtain credit unless the loan conforms with the requirements of the other Federal Reserve Regulations, including Regulation T. *See SEC v. Packer, Wilbur & Co.*, 362 F. Supp. 510, 515 (S.D.N.Y. 1973); *see also SEC v. Margolin*, No. 92 Civ. 6307 (PKL), 1992 WL 279735, at *4 (S.D.N.Y. Sept. 30, 1992) ("The relevant Federal Reserve Regulations are Regulation X … which is addressed to borrowers … Regulation X prohibits borrowers from causing brokers to extend credit in ways that violation Regulation T.").

[9]  While the court in one fraudulent trading scheme case considered possessing client funds and securities to be one factor in finding broker activity, that factor was not dispositive. *See Margolin*, 1992 WL 279735, at *5.

(2) receiving commissions in lieu of a salary; (3) selling securities of other issuers; (4) being involved in negotiations between an issuer and investor; (5) making valuations as to the merits of an investment or giving advice; and (6) being an active rather than a passive finder of investors. *See*, *e.g.*, *Martino*, 255 F. Supp. 2d at 283 (applying the *Hansen* factors); *Found. Ventures, LLC v. F2G, Ltd.*, No. 08 Civ. 10066 (PKL), 2010 WL 3187294, at *5 (S.D.N.Y. Aug. 11, 2010) (same); *Schatzki v. Weiser Capital Mgmt., LLC*, No. 10 Civ. 4685 (RWS), 2016 WL 6662264, at *4 (S.D.N.Y. Nov. 9, 2016) (citing *Hansen* and stating that the payment of commissions *from the sale of securities* is a "factor deemed highly probative on the issue of whether an unlicensed person is a broker under the Exchange Act"); *accord SEC v. CKB168 Holdings, Ltd.*, 210 F. Supp. 3d 421, 453 (E.D.N.Y. 2016) (applying the *Hansen* factors); *SEC v. StratoComm Corp.*, 2 F. Supp. 3d 240, 262 (N.D.N.Y. 2014) (same).

None of the "*Hansen* factors" is reflected in the facts alleged in the SEC's Complaint: GIS is not alleged to (1) be an employee of an issuer; (2) have received commissions as opposed to salary for the sale of securities; (3) have sold or have previously sold the securities of other issuers; (4) be involved in negotiations between any issuer and any investor; (5) make valuations as to the merits of an investment or give advice, or (6) be an *active* finder of investors. *Hansen*, 1984 WL 2413 at * 10. Certainly the SEC does not allege that GIS performed any of these activities for U.S. customers. And, though the "factors articulated in *Hansen* … [are] not designed to be exclusive," *SEC v. Benger*, 697 F. Supp. 2d 932, 945 (N.D. Ill. 2010), the SEC has nonetheless failed to sufficiently allege that GIS's *foreign activities* demonstrate regular participation in U.S. securities transactions at key points in the chain of distribution. *See Martino*, 255 F. Supp. 2d at 283.

The best the SEC can do to paint GIS's issuance of margin to its U.S. customers as broker activity is to cite to a factually inapposite and unpublished decision from the District of Utah

involving real estate transactions and Ponzi schemes. *See* Opp. Br., p. 18 (citing *SEC v. Art Intellect, Inc.*, No. 11 Civ. 357, 2013 WL 840048 (D. Utah Mar. 6, 2013)). But the court in *Art Intellect* found qualifying broker activity for Section 15(a) purposes only because the defendants "solicited investors to purchase securities in the form of investment contracts." *Art Intellect*, 2013 WL 840048, at *21. Here the only "solicitation" alleged by the SEC is that GIS, like countless other companies, maintained a website that could be accessed in the U.S.[10] (*See* Opp. Br., p. 18.) In other words, the SEC has cited no case finding a defendant to be a broker on the basis of extending credit to the plaintiff.

While the SEC also vaguely asserts that GIS "performed clearing and settlement services in connection with transactions in U.S. securities", the act of "'[m]erely bringing together the parties to transactions, even those involving the purchase and sale of securities, is not enough' to warrant broker registration under Section 15(a)". *SEC v. Kramer*, 778 F. Supp. 2d 1320, 1336 (M.D. Fla. 2011) (citing *Apex Glob. Partners, Inc. v. Kaye/Bassman Int'l Corp.*, No. 09 Civ. 637, 2009 WL 2777869 (N.D. Tex. Aug. 31, 2009)). Rather, there must be an allegation of "involvement at 'key points in the chain of distribution,' such as participating in the negotiation, analyzing the issuer's financial needs, discussing the details of the transaction, and recommending an investment." *Id*. GIS is not alleged to have participated in any of those activities. And,

---

[10]     In any event, contrary to the SEC's suggestion, *Art Intellect* does not state that "handling customer funds and securities … and extending or arranging for the extension of credit in connection with a securities transaction" is *per se* the activity of a broker, (*see* Opp. Br., at p. 18); rather, the case states that "*[a]ctions indicating that a person is 'effecting' securities* include …. extending or arranging for the extension of credit in connection with a securities transaction." *Art Intellect*, 2013 WL 840048, at *20 (emphasis added). Conversely, "the activities that indicate that a person may be a broker are solicitation of investors to purchase securities, involvement in negotiations between the issuer and the investor, and receipt of transaction-related compensation." *Id.* (citing *Hansen*). Even *Art Intellect* demonstrates that *Hansen* is the seminal case to consult when analyzing whether a particular activity is a broker activity, but it is not addressed once in the SEC's opposition brief.

according to the SEC's Complaint, "a UK custodial firm"—*not GIS*—"received the [U.S.] traders' securities electronically, and the trades settled in GIS's account at the UK custodial firm." (Compl., ¶ 15.) This *ex post* involvement in already-accomplished securities transactions which the SEC concedes took place at an entirely different UK entity simply does not amount to participation by GIS at a key point in the chain of distribution.

Even if GIS brought together parties to a securities transaction and "receive[d] a fee 'in proportion to the amount of the sale'—*i.e.*, a percentage of the total payment rather than a flat fee—the [SEC] (in a series of 'no-action' letters) 'has been willing to find that there was no need for registration ...." *Kramer*, 778 F. Supp. 2d at 1336 (citing David A. Lipton, 15 Broker-Dealer Regulation § 1:18).[11] Further, GIS did not control any of the activities of its U.S. customers' accounts. *SEC v. Mapp*, 240 F. Supp. 3d 569, 593 (E.D. Tex. 2017) (dismissing a case at the Rule 12 stage where the Commission presented no evidence that defendant possessed "authority over the accounts of others"). "[M]erely facilitating securities transactions" alone is, therefore, insufficient to demonstrate that an entity is performing the functions of a broker. *Id.* at 592.

Last, in alleging that GIS solicited U.S. customers,[12] the SEC again grasps at straws. The SEC merely argues that GIS's website was accessible in the U.S. and promoted GIS's services

---

[11]     Courts consider receipt of "transaction-based compensation" when a person involved in the sale of a security receives a commission or similar fee in connection with the sale of an issuer's security. *See, e.g.*, *SEC v. Collyard*, 154 F. Supp. 3d 781, 789 (D. Minn 2015) (collecting cases), *vacated in part on other grounds*. Though courts have recognized that, in such instances, the receipt of transaction-based compensation is an indicator of brokerage activity (though not necessarily dispositive), the relevant conduct alleged here is sufficiently removed. While the fees charged by GIS were allegedly assessed on a transaction-by-transaction basis, the SEC has not alleged that GIS had any ability to influence the outcome of any transaction, or was the entity buying or selling a U.S. issuer's security. Thus, GIS was not receiving "commissions" for its role in trading securities—any fees were levied for GIS's margin services.

[12]     Contrary to the SEC's suggestion, GIS was not arguing in its moving brief that the SEC was required to address Rule 15a-6 in the Complaint. Rather, the point of citing that agency rule was

(which GIS is registered to perform in the U.K. (*see* Compl., ¶ 10.)) (Opp. Br., at p. 5; Compl., ¶ 22.)  Unsurprisingly, the SEC cites no case that holds this extremely common practice of maintaining a website to amount to the active solicitation of U.S. clients to engage in securities transactions.  In the only case cited by the SEC concerning solicitation, *SEC v. Rabinovich & Assoc., LP*, No. 07 Civ. 10547 (GEL), 2008 WL 4937360, at *5 (S.D.N.Y. Nov. 18, 2008), the court found the defendant's "ongoing business operation that included trading in securities for compensation, and … receiv[ing] commissions based on his sale of interests" in securities amounted to "activities indicative of being a broker …." *Id.*  Here, there is no allegation that GIS ever traded securities for compensation, nor is there an allegation that GIS *actively* solicited investors.  *See Kramer*, 778 F. Supp. at 1337 (finding active solicitation by defendant distributing promotional material and directing people to its website).

**B.  The SEC Agrees and Admits that GIS "Was Not a Party" to the Domestic Securities Transactions and Was Not Involved in The Initial Placement or Execution of Any Securities Orders.**

The SEC rightly acknowledges that GIS "'was not a party' to the domestic securities transactions and was not involved in the initial placement or the execution of the orders."  (Opp. Br., p. 21.)  Nonetheless, the SEC asserts that this fact "does nothing to support Defendants' *Morrison* argument" because the fact that the "clearing and settlement process GIS carried out in London does not alter the fact that the transactions that GIS cleared were domestic."  (*Id.*)  As such, the SEC argues, "[t]he clearing process carried out the intent of the parties but was *not* the 'transaction' for *Morrison* purposes."  (*Id.*)  The SEC is mistaken.

---

to underscore that the SEC, when alleging solicitation as a brokerage activity, must allege facts that demonstrate the active, rather than mere passive, solicitation of customers.  The SEC has not meaningfully disputed that principle.

The "transaction" for *Morrison* purposes must be the transaction directly linked to the alleged violator. To hold otherwise would essentially resurrect the "conduct or effects" test that *Morrison* properly dismantled. *See SEC v. Berger*, 322 F.3d 187, 192-93 (2d Cir. 2003) (discussing "conduct or effects" test). The test to be applied here is simple: "to bring a suit . . . the transaction at issue—the *conduct* underlying the suit—must have occurred within the United States." *Loginovskaya v. Batatchenko*, 764 F.3d 266, 273 (2d Cir. 2014) (emphasis added). The alleged offending conduct here— "providing clearance and settlement services, extending margin to customers, holding customer cash and securities, receiving transaction-based compensation, and soliciting customers," (Compl., ¶ 12) in violation of Section 15(a)—all occurred in the U.K., not the U.S. Even viewing these facts in a light most favorable to the SEC, the conduct—*the transactions involving GIS*—took place overseas.

"[T]here are two ways to allege a 'domestic transaction.'" *Loginovskaya*, 764 F.3d at 273-74 (citing *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60 (2d Cir. 2012)). First, "it is sufficient for the plaintiff to allege that title to the [security] was transferred within the United States." *Id.* Second, a plaintiff may allege facts showing "that the parties incurred irrevocable liability within the United States: that is, that the purchaser incurred irrevocable liability within the United States to take and pay for a security, or that the seller incurred irrevocable liability within the United States to deliver a security." *Id.* The SEC's complaint is devoid of any facts demonstrating either of these jurisdictional prerequisites for GIS's conduct.[13]

---

[13] "[T]he SEC has applied the securities law extraterritorially in ways *Morrison* roundly rejected." Arthur B. Laby, *Symposium: Revolution in the Regulation of Finance Advice: The U.S., the U.K. and Australia: International Issues in the Regulation of Financial Advice: Regulation of Global Financial Firms After Morrison v. National Australia Bank*, 87 ST. JOHN'S L. REV. 561, 572 (2013).

*Morrison*'s tests apply to Section 15(a), and the SEC is required to allege facts sufficient to establish a domestic transaction involving GIS. *See*, *e.g.*, *SEC v. Battoo*, 158 F. Supp. 3d 676, 693 n.14 (N.D. Ill. 2016) ("*Morrison* also applies to Section 15 of the Exchange Act"). The SEC simply did not do so here. The U.S. account holders alleged to have bought and sold U.S. securities are not named in the SEC's Complaint—GIS is. *See Arco Capital Corps. Ltd. v. Deutsche Bank AG*, 949 F. Supp. 2d 532, 541 (S.D.N.Y. 2013) ("While potentially relevant under conduct and effects test, courts have found such pleadings that 'some acts that ultimately result in the execution of the transaction abroad [took] place in the United States amounts to nothing more than the reinstatement of the conducts test." (alteration in original) (quoting *Pope Invs. II, LLC v. Deheng Law Firm*, No. 10 Civ. 6608 (LLS), 2012 WL 3526621, at *8 (S.D.N.Y. Aug. 15, 2012))). The SEC does not allege that GIS obtained title to a security within the U.S., that GIS exchanged any funds in the U.S. or that GIS ever purchased or sold a U.S. security.

Merely extending margin in the U.K. to U.S. traders, holding the customers' securities in a U.K. omnibus account (*at a non-GIS UK custodial firm*, *see* Compl., ¶ 15) as collateral for those loans, and charging fees in the U.K. for those margin services does not constitute effecting any transactions in, or the inducement of a purchase or sale of, any security in the U.S. The SEC's Complaint, therefore, fails to plausibly allege that GIS utilized U.S. exchange facilities and fails to allege facts leading to the inference of a domestic transaction. The SEC's Complaint against both GIS and Mr. Gunn must be dismissed.

**C.    The SEC Admits the Inclusion of "Knowingly" in the Complaint Was an "Inadvertent Error" and Now Seeks to Pursue Aiding and Abetting Under a Recklessness Theory.**

The SEC has not properly pled scienter to allege a violation of Section 20(e) for Mr. Gunn, and now, having been notified by the Defendants of that fact, the SEC seeks to switch its scienter

theory midstream: "The SEC recognizes that the legal 'Claim for Relief' section of the Complaint (¶ 31) alleges only that 'Gunn knowingly provided substantial assistance' rather than that he did so 'knowingly and recklessly.' This was an inadvertent error." (Opp. Br., at p. 24.)

For "knowing" "aiding and abetting claims, the SEC must allege (1) a primary violation of the Exchange Act, (2) actual knowledge of the violation by the aider and abettor, and (3) that the aider and abettor substantially assisted the primary violation." *SEC v. Tuzman*, No. 15 Civ. 7057 (AJN), 2017 WL 11606728, at *17 (S.D.N.Y. Sept. 29, 2017) (quoting *SEC v. Espuelas*, 579 F. Supp. 2d 461, 484 (S.D.N.Y. 2008)). But the SEC's only allegation in support of Mr. Gunn's actual knowledge of GIS's violations in the Complaint is a conclusory statement that Mr. Gunn "knowingly provided substantial assistance to the violations of Section 15(a) of the Exchange Act …."[14] (Compl., ¶ 31.) In an improper attempt to rectify this shortcoming, the SEC now (1) asks the Court to consider a "reckless" scienter theory; (2) cites to facts outside of the Complaint (*i.e.*, "47 comfort letters signed by Gunn"); and (3) references Mr. Gunn's "involvement" with GIS as "founder, chairman, compliance officer," as if that was sufficient to allege Mr. Gunn's "actual knowledge *of the violation*" of Section 15(a). *See Tuzman*, 2017 WL 11606728, at *17 (emphasis added). This Court should not give the SEC a pass.

When the SEC chose to allege only that Mr. Gunn knowingly aided and abetted GIS's alleged violations of Section 15(a), the onus was on the SEC to allege sufficient facts in the Complaint demonstrating actual knowledge. *See Espuelas*, 579 F. Supp. 2d at 471. The SEC did not do so, and it now tacitly admits the error. "Allegations in a pleading are 'judicial admissions'

---

[14]     The SEC quotes *SEC v. Paulsen*, No. 18 Civ. 6718 (PGG), 2020 WL 6263180, at *14 (S.D.N.Y. Oct. 23, 2020), to argue that it must only allege "defendant's general awareness of [his] overall role in the primary violator's illegal scheme." But *Paulsen* is an unpublished decision analyzing the sufficiency of a Section 10(b) claim on the merits. Even if *Paulsen* is instructive, the SEC did not articulate a single fact in the Complaint reflecting Mr. Gunn's "general awareness of [his] overall role in [GIS's]" illegality.

which bind a party 'throughout the course of the proceeding.'" *In re Worldcom, Inc. Sec. Litig.*, 308 F. Supp. 2d 214, 232 (S.D.N.Y. 2004) (vacated on other grounds) (citing *Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers and Lybrand, LLP*, 322 F.3d 147, 167 (2d Cir. 2003)). "Judicial efficiency demands that a party not be allowed to controvert what is has already unequivocally told a court by the most formal and considered means possible." *Id.*

Additionally, given that the Court is analyzing this issue under Rule 12(b)(6), it cannot consider facts outside of the Complaint when assessing the adequacy of the SEC's claims. *See Friedl v. City of New York*, 210 F.3d 79, 83 (2d Cir. 2000) (when matters outside the pleadings are presented in response to a Rule 12(b)(6) motion, a district court must exclude the additional material and decide the motion on the complaint alone). The SEC knows this full well, but nonetheless cites to a declaration to support its view that the Complaint sufficiently alleges that Mr. Gunn had the requisite scienter. (*See* Opp. Br., p. 26.) The SEC cannot use a declaration to attempt to cure an insufficient Complaint.

Notwithstanding published precedent in this jurisdiction, *see Espuelas*, 579 F. Supp. 2d at 471, the SEC states that it "need not plead a legal cause of action correctly or at all to withstand a motion to dismiss, so long as the factual allegations suffice to state a claim on which relief may be granted." (Opp. Br., p. 25.) None of the SEC's cited cases, however, addresses pleading requirements for aiding and abetting claims in the securities context. *See*, *e.g.*, *Oneida Indian Nation of N.Y. v. County of Oneida*, 617 F.3d 114, 139 (2d Cir. 2010) (ancient tribal land claims); *Hack v. President & Fellows of Yale College*, 237 F. 3d 81 (2d Cir. 2000) (violations of the Fair Housing Act). Securities cases analyzing aiding and abetting are clear: When a "knowing" aiding and abetting claim is alleged, the SEC must allege facts demonstrating actual knowledge. *See Espuelas*, 579 F. Supp.2d at 471. It did not do so.

Because the SEC has only offered a formulaic recitation of the elements of an aiding and abetting cause of action with insufficient factual support, its Complaint as against Mr. Gunn should be dismissed for failure to state a claim.

## CONCLUSION

For the foregoing reasons, Defendants Global Investment Strategy UK Limited and John William Gunn respectfully request that this Court dismiss the Complaint with prejudice.


DATED: May 28, 2021                    Respectfully Submitted,

                                       **DLA Piper LLP (US)**

                                       By:  _/s/_ Caryn Schechtman

                                       Caryn Schechtman
                                       Thomas Alford
                                       Joshua Kane
                                       1251 Avenue of the Americas
                                       New York, NY 10020
                                       Tel:  212-335-4500
                                       caryn.schechtman@us.dlapiper.com
                                       thomas.alford@us.dlapiper.com
                                       joshua.kane@us.dlapiper.com

                                       *Counsel for Defendants*
                                       *Global Investment Strategy UK Ltd. and*
                                       *John William Gunn*