UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- X
                                                               :
SECURITIES EXCHANGE COMMISSION,                                :
                                                               :   **ORDER DENYING MOTION TO**
                              Plaintiff,                       :   **DISMISS FOR INSUFFICIENT**
    -against-                                                  :   **SERVICE OF PROCESS, LACK**
                                                               :   **OF PERSONAL JURISDICTION,**
GLOBAL INVESTMENT STRATEGY UK LTD.                             :   **AND FAILURE TO STATE A**
and JOHN WILLIAM GUNN,                                         :   **CLAIM**
                                                               :
                              Defendants.                      :   20 Civ. 10838 (AKH)
                                                               :
                                                               :
-------------------------------------------------------------- X

ALVIN K. HELLERSTEIN, U.S.D.J.:

      Plaintiff Securities Exchange Commission ("SEC") filed this action on December 22, 2020, against Defendants Global Investment Strategy UK Ltd. ("GIS") and John William Gunn ("Gunn"), (collectively "Defendants"), alleging violations of Section 15(a) and 20(e) of the Securities Exchange Act of 1934, 15 U.S.C. § 78. Compl., ECF No. 1. Defendants move to dismiss the Complaint against Defendant Gunn under Fed. R. Civ. P. 12(b)(5) for insufficient service of process and under Fed. R. Civ. P. 12(b)(2) for lack of personal jurisdiction; and against both Defendants, under Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief may be granted. Motion to Dismiss ("MTD"), ECF No. 19.

## BACKGROUND

      The following facts are taken from the SEC's Complaint, which I must "accept[] as true" for the purpose of this motion. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The SEC alleges that, from 2015 through 2019, Defendant GIS, a United Kingdom (UK) based financial services firm, provided securities clearing and settlement services to more than 600 U.S. customers for trades in U.S. securities issued by U.S. entities while failing to register with the SEC as a broker-dealer, in violation of Section 15(a) of the Exchange Act, 15 U.S.C. § 78o(a). Complaint, ECF

No. 1, ¶¶ 2, 4.  It alleges that Defendant Gunn, the founder, chairman, compliance officer, and principal of GIS, aided and abetted GIS's violations, in violation of Section 20(e) of the Exchange Act, 15 U.S.C. § 78(t)(e).  *Id.* ¶¶ 5, 11.

GIS had at least two types of U.S.-based customers, each with its own type of account: First, GIS had approximately 40 U.S.-based financial "backers," entities that opened omnibus accounts at GIS.  *Id.* ¶ 13.  Second, GIS had more than 600 U.S.-based day traders who had sub-accounts at GIS that were linked to a U.S. backer's omnibus account.  *Id.*  The backers and their day traders purchased allocations of securities issued by U.S. companies and governmental entities, among other issuers, using delivery-versus-payment ("DVP") accounts at U.S. introducing broker-dealers.  *Id.* ¶ 14.  The DVP accounts do not hold securities or cash, and the day traders instructed their introducing broker-dealers to clear and settle their trades at GIS.  *Id.*  GIS charged U.S. backers and day traders commission of approximately $34 to $55 per trade for clearing and settlement services, as well as fees for other services, such as curing failed trades.  *Id.* ¶ 17.  Further, the benefit of clearing trades through GIS was the increased leverage available—GIS offers customers greater margin or credit than that available through registered broker-dealers, who are bound by rules limiting the amount a customer can initially borrow from a registered broker-dealer to purchase an equity security.  *Id.* ¶¶ 19–20.

In addition, "GIS's website was accessible in the United States and solicited customers by promoting its 'global multi-asset trade execution, clearing, safe custody and stock lending solutions to a combination of financial institutions, fund managers and wealth officers.' The website also stated that it provided 'dedicated coverage to clients across both UK and US trading hours' []."  *Id.* ¶ 22.

## DISCUSSION

**I.   Insufficient Service of Process**

Defendant Gunn moves to dismiss the complaint for insufficient service of process. Motion to Dismiss, at 6–9. He argues that service was deficient under Fed. R. Civ. P. 4(f)(2)(C)(ii), which provides for service on a foreign defendant, because the SEC mailed its Complaint through the Clerk of Court to Gunn's place of business rather than his residence or domicile, as is required under Rule 6.9 of the English Civil Procedure Rules. Motion, at 7.

A.  Legal Standard

Because Plaintiff served the Summons and Complaint on Defendant Gunn in the UK, Section 10(a) of the Hague Convention applies. *See* Fed. R. Civ. P. 4(f)(1) (providing that an individual in a foreign country may be served "by any internationally agreed means of service that is reasonably calculated to give notice, such as those authorized by the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents). When service occurs in a signatory country, under Fed. R. Civ. P. 4(f)(2)(C)(ii), "service by mail is permissible if two conditions are met: first, the receiving state has not objected to service by mail; and second, service by mail is authorized under otherwise-applicable law." *Water Splash, Inc. v. Menon*, 137 S. Ct. 1504, 1513 (2017) (citing *Brockmeyer v. May*, 383 F.3d 798, 803–04 (9th Cir. 2004)). Mail service must also be "reasonably calculated to give notice." Fed. R. Civ. P. 4(f)(2); *Ackerman v. Levine*, 788 F.2d 830, 838 (2d Cir. 1986).

The U.K., a signatory to the Hague Convention does not object to Article 10(a), and the Second Circuit has construed this to mean that service of process by international mail is valid. *See, e.g.*, *Wilson v. Austin*, No. 11-CV-4594, U.S. Dist. LEXIS 123067, at *15 (June 25, 2012); *Complexions, Inc. v. Indus. Outfitters, Inc.*, No. 09-CV-1402, 2011 U.S. Dist. LEXIS 88047, at *21 (N.D.N.Y. Aug. 9, 2011). Courts have held that service made via registered mail, to a defendant's last known address is sufficient, even if the defendant no longer resides at the

address at the time service is effectuated, where defendant "does not assert, nor does the record establish," that the address to which service was made was not previously her address, and where the defendant otherwise "received notice of the [] action." *Complexions*, 2011 U.S. Dist. LEXIS 88047, at *22. Moreover, the Southern District of New York's Clerk of Court has established procedures for serving a complaint on a foreign defendant. *See* S.D.N.Y. Foreign Mailing Instruction, *available at* https://www.nysd.uscourts.gov/forms/foreign-mailinginstructions.

B. Analysis

I hold that service of process on Defendant Gunn was sufficient. First, Plaintiff complied with the procedural requirements of Fed. R. Civ. P. 4(f)(2)(C)(ii). On December 29, 2020, Plaintiff delivered a letter to the Clerk's Office requesting service by Federal Express of the Summons and Complaint and other documents to GIS and Gunn at 2nd floor, 2 London Wall Buildings, London. Dkt. No. 10-5. On December 30, 2020, the Clerk posted Certificates of Mailing certifying under penalty of perjury that copies of the service documents were served on GIS and Gunn pursuant to Rule 4(f)(2)(C)(ii). Dkt. No. 10-6. On January 7, 2021, after receiving proofs of service from Federal Express, Plaintiff filed its Affirmation of Service. Dkt. No. 10, Ex. 7. In addition, Plaintiff emailed a courtesy copy of the Complaint to Gunn's U.S. lawyers. Dkt. No. 10. Despite Gunn's arguments to the contrary, service to a place of business is not improper under Rule 4 or English Civil Procedure Rules. In fact, Rule 6.3 authorizes service by "first class post, document exchange or other service which provides for delivery on the next business day." Eng. Civ. P. R. 6.3(1)(b); *see also Evriholder Products LLC v. Simply LBS Ltd.*, No. 17-CV-4329, 2020 WL 7060336, at *3 (S.D.N.Y. Apr. 21, 2020) (upholding service where the Clerk of Court sent the Summons and Complaint to defendant's business in Hong Kong via Federal Express); *Polagrid LLC v. Videsh Sanchar Nigam Limited*, No. 04-CV-9578, 2006 WL 903184, at *2 (S.D.N.Y. Apr. 7, 2006) (Clerk of Court's mailing via Federal

Express of Summons and Complaint to defendant's office in India was "undoubtedly sufficient" under Rule 4(f)(2)(C)(ii)).

Second, service was reasonably calculated to, and did give notice, to Gunn. Although service was not completed until December 30, 2020, Gunn had notice of this action. Two days after Plaintiff emailed Gunn's U.S. lawyers a courtesy copy of the Complaint, Gunn issued a press release acknowledging the Complaint and discussing its allegations.

Defendant Gunn's motion to dismiss for insufficient service of process is denied.

### III. Personal Jurisdiction

Defendant Gunn also moves to dismiss the Complaint for lack of personal jurisdiction under Fed. R. Civ. P. 12(b)(2). Motion, at 9–13. He argues that the Complaint "makes no specific allegations concerning Mr. Gunn or any activity in the U.S." *Id.* at 11.

A. Legal Standard

"In order to survive a motion to dismiss for lack of personal jurisdiction, a plaintiff must make a prima facie showing that jurisdiction exists." *Thomas v. Ashcroft*, 470 F.3d 491, 495 (2d Cir.2006). This prima facie showing "must include an averment of facts that, if credited by the ultimate trier of fact, would suffice to establish jurisdiction over the defendant." *Chloé v. Queen Bee of Beverly Hills*, LLC, 616 F.3d 158, 163 (2d Cir.2010) (brackets omitted). Federal courts must satisfy three requirements in order to exercise personal jurisdiction over an entity: (1) the entity must have been properly served, (2) the court must have a statutory basis for exercising personal jurisdiction, and (3) the exercise of personal jurisdiction must comport with constitutional due process. *See Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 59-60 (2d Cir. 2012).

On a Rule 12(b)(2) motion, the court may look beyond the four corners of the complaint and consider materials outside of the pleadings, including accompanying affidavits, declarations, and other written materials. *See Jonas v. Estate of Leven*, 116 F. Supp. 3d 314, 323

(S.D.N.Y. 2015) (citing *MacDermid, Inc. v. Deiter*, 702 F.3d 725, 727 (2d Cir. 2012)). "In evaluating whether the requisite showing has been made," a court must "construe the pleadings and any supporting materials in the light most favorable" to the plaintiff. *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 167 (2d Cir. 2013).

In a securities case, personal jurisdiction is governed by Section 27 of the Exchange Act, 15 U.S.C. § 78aa, which is coterminous with the Due Process Clause of the Fifth Amendment. *See SEC v. Sharef*, 924 F. Supp. 2d 539, 544 (S.D.N.Y. 2013); *Das Rio Tinto PLC*, 332 F. Supp. 3d 786, 799 (S.D.N.Y. 2019) (indicating that the Exchange Act "permits the exercise of personal jurisdiction to the limit of the Due Process Clause").

Under the Due Process Clause, "a tribunal's authority depends on the defendant's having such 'contacts' with the forum State that 'the maintenance of the suit' is 'reasonable, in the context of our federal system of government,' and 'does not offend traditional notions of fair play and substantial justice.'" *Ford Motor Co. v. Montana Eighth Judicial Dist. Ct.*, 141 S. Ct. 1017, 1024 (2021) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316–17 (1945)). When a defendant is "essentially at home" in the forum, a court may exercise general jurisdiction over a defendant over "any and all claims" brought against him. *See id.* General jurisdiction only applies to an individual, however, in his place of domicile. A court may exercise specific jurisdiction over a defendant over a narrower class of claims, when the defendant has certain minimum contacts with the forum, such that by "some act [he] purposefully avails [himself] of the privilege of conducting activities within the forum State." *Id.* at 1024–25 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)). The contacts must be deliberate, such as "'exploi[ting] a market' in the forum State or entering a contractual relationship centered there." *Id.* at 1025 (quoting *Walden v. Fiore*, 571 U.S. 277, 285 (2014)). Finally, the plaintiff's claims "must arise out of or relate to the defendant's contact" with the forum. *Id.* (citing *Bristol-Myers Squibb Co. v. Superior Court*, 137 S. Ct. 1773 (2017)).

B. Analysis

Although Defendant Gunn is not subject to general jurisdiction because he is a U.K. citizen, residing in Hong Kong, I hold that he is subject to specific jurisdiction. The Complaint makes the following allegations: Gunn "directed and was involved in all aspects of GIS's operation, including its brokerage activities for U.S. customers." Compl. ¶23. He "travelled to the Unites States, including to Manhattan, on a number of occasions to meet with U.S. customers." *Id.* He solicited business from U.S. customers in signed emails, indicating that he was "very happy to discuss [GIS's] services with [them] further." *Id.* Decl. Ex. 2, at 2. "Gunn communicated with the [U.S.] backers and sub-account traders regarding opening and closing accounts at GIS," Compl. ¶ 24, and he "assisted the day traders in setting up the delivery versus payment accounts at the U.S. introducing brokers." *Id.* ¶ 25. I find that Gunn has more than "minimal contacts" with the United States, not only traveling here and soliciting business from U.S. customers but also engaging in transactions related to securities bought and sold on the U.S. Exchanges. In addition, I find it reasonable to exercise jurisdiction over Gunn because in seeking to facilitate U.S. Exchange-based securities transactions, Gunn could reasonably anticipate being haled into a U.S. court to account for the consequences of his actions. *See SEC v. Unifund SAL*, 910 F.2d 1028, 1033 (2d Cir. 1990); *accord. World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).

Defendant Gunn's motion to dismiss for lack of personal jurisdiction is denied.

**IV.     Failure to State a Claim**

Defendants GIS and Gunn move to dismiss the Complaint pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted. First, they were not engaged in brokerage activity, and their alleged misconduct is subject to regulation by the Federal Reserve Board, and not under the jurisdiction of the SEC. Motion, at 14–15. Second, the SEC fails to allege the "necessary domestic nexus for the transactions at issue." *Id.* at 16.

Third, even if Section 15(a) applies, and the Complaint plausibly alleges a domestic nexus, GIS "qualifies for the safe harbor protection under Rule 15a-6." *Id.* at 21–22. Finally, as to Defendant Gunn, the Complaint fails to plead the requisite scienter to establish that Gunn aided and abetted GIS's violation of Section 15(a). *Id.* at 23–24.

### A. Legal Standard

In ruling on a motion to dismiss, the court must accept the factual allegations in the complaint as true and draw all reasonable inferences in favor of the nonmoving party. *Gregory v. Daly*, 243 F.3d 687, 691 (2d Cir. 2001), as amended (Apr. 20, 2001). To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

When considering a motion to dismiss a complaint under Rule 12, the Court must "accept[] all of the complaint's factual allegations as true and draw[] all reasonable inferences in the plaintiff's favor." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007) However, the Court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678. The Court is limited to a "narrow universe of materials." *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016). "Generally, [courts] do not look beyond 'facts stated on the face of the complaint, . . . documents appended to the complaint or incorporated in the complaint by reference, and . . . matters of which judicial notice may be taken.'" *Id.* (quoting *Concord Assocs., L.P. v. Entm't Props. Tr.*, 817 F.3d 46, 51 n.2 (2d Cir. 2016)) (alterations in original).

B. Analysis

    1. Registration as Broker-Dealer

Defendants argue that they were not engaged in brokerage activity, and therefore, not required to register as a broker-dealer with the SEC. They argue that extending credit (or providing margin) for the purpose of purchasing and carrying securities is not a broker-dealer activity and therefore cannot serve as the basis for a Section 15(a) violation. *See* Motion, at 14. They further argue that lending activities, including the extension of credit by foreign persons to U.S. persons for the purpose of purchasing securities are authorized by U.S. law and subject to regulation by the Board of Governors of the Federal Reserve Board ("FRB") and not the SEC. *See id.* at 15 (citing 12 C.F.R. § 221.1). Because the FRB has not prohibited non-broker dealers from extending credit and instead adopted extensive regulations, Defendants argue that GIS's act of financing securities purchases for a fee cannot itself be considered brokerage activity. *See id.*

Section 15(a) of the Exchange Act makes it unlawful for an unregistered broker or dealer to "make use of the mails or any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security." 15 U.S.C. § 78o(a)(1). The Act defines a broker as "any person engaged in the business of effecting transactions in securities for the account of others." 15 U.S.C. § 78c(a)(4)(A).

In determining whether an individual or entity falls within this definition, courts consider whether the individual or entity may be "characterized by 'a certain regularity of participation in securities transactions at key points in the chain of distribution.'" *SEC v. Martino*, 255 F. Supp. 268, 283 (S.D.N.Y. 2003). They further consider "whether the alleged broker satisfies some of the following factors: 1) is an employee of the issuer; 2) received commissions as opposed to a salary; 3) is selling, or previously sold, the securities of other issuers; 4) is involved in negotiations between the issuer and the investor; 5) makes valuations as to the merits of the investment or gives advice; and 6) is an active rather than passive finder of

9

investors." *SEC v. CKB168 Holdings, Ltd.*, 210 F. Supp. 3d 421, 453 (E.D.N.Y. 2016) (internal quotation marks and citation omitted) (noting that most courts do not require the SEC to establish all factors, but a combination of factors establishing a defendant acted as a broker); *see also SEC v. Rabinovich & Assocs., LP*, No. 07-CV-10547, 2008 U.S. Dist. LEXIS 93595, at *5 (S.D.N.Y. Nov. 18, 2008) ("Among the activities indicative of being a broker are soliciting investors, participating in the securities business with some degree of regularity, and receiving transaction-based compensation."); *see also* SEC, Guide to Broker-Dealer Registration (Apr. 2008), available at  http://www.sec.gov/divisions/marketreg/bdguide.htm, at 4-5 ("In order to determine whether [an individual] . . . is a broker, we look at the activities that the person or business actually performs," and ask, for example, whether it "participate[s] in important parts of a securities transaction, including solicitation, negotiation, or execution of the transaction," receives "transaction-related compensation," and/or "handle[s] the securities or funds of others in connection with securities transactions.").

As an initial matter, the Court rejects Defendants' contention that the regulatory authority granted to the FRB ousts the SEC of jurisdiction.  Defendants offer no authority, in statute or case law, to support this argument, and as other courts have noted, "[b]ecause we live in an age of overlapping and concurring regulatory jurisdiction…, a court must proceed with the utmost caution before concluding that one agency may not regulate merely because another may."  *FTC v. Ken Roberts Co.*, 276 F.3d 583, 593 (D.C. Cir. 2001) (internal quotation marks and citations omitted).  That the FRB has authority to regulate lending does not restrict the SEC's statutory authority to regulate broker-dealers, simply because broker-dealers engage in lending activities subject to regulation by the FRB.

As to the sufficiency of the allegations regarding GIS's violation of Section 15(a), the Complaint alleges that GIS performed many of the functions that courts routinely recognize as brokerage activity.  The Complaint alleges that GIS handled customer funds and securities.

10

Compl. ¶¶ 2, 12, 15, 21, 26.  It alleges that GIS extended credit in connection with securities transactions.  *See id.* ¶¶ 2, 12, 19, 20.  It alleges that GIS regularly participated in the U.S. securities business.  *See id.* ¶¶ 2, 12–16, 18, 23–25.  It alleges that GIS received transaction-based compensation in the form of commissions.  *See id.* ¶¶ 17–18, 20.  Finally, it alleges that GIS performed clearing and settlement services in connection with transactions in U.S. securities issued by U.S. issuers to U.S. customers, just as U.S. clearing brokers do.  *See id.* ¶¶ 2, 12–16.  In addition, the Complaint alleges that Gunn traveled to the U.S., including Manhattan, to meet with GIS customers and sent comfort letters to the introducing broker-dealers, detailing its services and guaranteeing that it would honor transactions confirmed through its trade clearing process.  *Id.* ¶¶ 23, 26.

    Contrary to Defendants' assertions, the Complaint does not merely allege that GIS extended credit or provided margin.  Rather, it alleges that GIS engaged in a host of broker activities, essentially the back-end credit and clearing services for securities transactions—services that were integral to and necessary to "effect securities transaction."  The Complaint therefore plausibly alleges that GIS was engaged in brokerage activity, requiring it to register with the SEC.  *See Kyung Sup Ahn v. Rooney, Pace Inc.*, 624 F. Supp. 368, 369 (S.D.N.Y. 1985) ("It is customary in the case of smaller brokers…for another entity, called the 'clearing broker,' to perform the mechanical record-keeping functions relating to the clearance and settlement of various transactions in customer accounts."); *SEC v. Margolin*, No. 92-CV-6307, 1992 U.S. Dist. LEXIS 14872, at *5 (S.D.N.Y. Sept. 30, 1992) (finding merit in a Section 15(a)(1) claim where the defendant "provided clearing services" for many transactions, "receiv[ed] transaction-based compensation, advertis[ed] for clients, and possess[ed] client funds and securities").  Because the Complaint further alleges that GIS has never been registered as a broker-dealer, nor associated with a registered broker-dealer, I find that it plausibly alleges that GIS violated Section 15(a).

2. Domestic Nexus

Defendants next argue that the Complaint seeks to impermissibly apply the U.S. securities laws extraterritorially in contravention of the Supreme Court's ruling in *Morrison*. Motion, at 16–23.

In *Morrison,* the Supreme Court held that Section 10(b) of the Exchange Act does not apply extraterritorially and "reaches the use of a manipulative or deceptive device or contrivance in connection with the purchase or sale of a security listed on an American stock exchange, and the purchase or sale of any other security in the United States." *See Morrison v. Nat'l Australia Bank*, 561 U.S. 247, 265, 273 (2010). Courts have held that the reasoning of *Morrison* applies to other provisions of the federal securities laws. *See, e.g.*, *SEC v. Goldman Sachs & Co.*, 790 F. Supp. 2d 147, 164 (S.D.N.Y. 2011) (finding that *Morrison* applies to Section 17(a) of the Securities Act). Although the Second Circuit has never held that *Morrison* applies to Section 15(a) of the Exchange Act, district courts in the Seventh Circuit have so held. *See United States v. Benger*, 934 F. Supp. 2d 1008, 1011 (N.D. Ill. 2013) (finding that "the regulatory purpose of Section 15(a) is virtually the same as that of Section 10(b)" (quotations omitted)); *SEC v. Battoo*, 158 F. Supp. 3d 676, 694 n.14 (N.D. Ill. 2016). I do not find it necessary to consider whether *Morrison* applies, however, as the Complaint does not seek to apply the Exchange Act extraterritorially. Rather, it alleges domestic transactions in securities issued by U.S. companies.

A domestic transaction occurs when "title to the [security is] transferred within the United States," or "the purchaser incur[s] irrevocable liability within the United States to take and pay for a security . . . ." *Absolute Activist Value Master Fund Ltd. V. Ficeto*, 677 F.3d 60, 68 (2d Cir. 2012). In determining the locus of securities transactions for *Morrison* purposes, courts focus on "the transactions themselves" and not "actions needed to carry out the transactions." *Loginovskaya v. Batratchenko*, 764 F.3d 266, 274 (2d Cir. 2014).

12

Defendants argue that the transactions at issue were not domestic because GIS carried out the clearing and settlement process in London. However, Defendants do not dispute the Complaint's allegations that transactions were "executed using U.S. registered broker-dealers," or that "the SEC has identified transactions involving U.S. securities." Motion, at 20–21. Unlike in *Morrison*, where the transactions involved securities on wholly foreign exchanges, and the Supreme Court found the defendants' domestic conduct insubstantial, here the Complaint alleges GIS provided clearing and settlement services, as well as extended margin or credit, to U.S.-based customers, including approximately 40 U.S.-resident financial backers and more than 600 U.S.-resident day traders. *See* Compl. ¶¶ 13–14. It further alleges that charged U.S. backers and traders "approximately $34 to $55 per trade for clearing and settlement services, as well as fees for other brokerage services, such as curing failed trades," and that "GIS received more than $8.5 million in commission revenue from its U.S. customers . . . ." *Id.* ¶ 17–18. Finally, the Complaint alleges that "GIS's website was accessible in the United States and solicited customers by promoting its 'global multi-asset trade execution, clearing, safe custody and stock lending solutions to a combination of financial institutions, fund managers and wealth officers[,]'" and that "GIS's website also stated that it provided 'dedicated coverage to clients across both UK and US trading hours[.]'" *Id.* ¶ 22.

In addition, the Complaint alleges that Defendant Gunn, "[a]s GIS's founder, chairman, compliance officer and principal, [] directed and was involved in all aspects of GIS's operations, including its brokerage activities for U.S. customers." *Id.* ¶ 23. "Gunn has been involved, among other things, in onboarding new customers, opening and closing accounts, and resolving trading and leverage issues." *Id.* Gunn also "travelled to the United States, including to Manhattan, on a number of occasions to meet with GIS customers." *Id.* In addition, Gunn sent numerous "comfort letters" to U.S.-based introducing broker-dealers, "several of which were located in Manhattan." *Id.* ¶ 25.

I hold that the Complaint plausibly alleges domestic transactions within the reach of Section 15(a) because this case involves U.S. purchasers acquiring U.S. securities in the United States.

      3.   Safe Harbor Exemption Under Rule 15a-6

Defendants argue that even if GIS's activities were brokerage activities, GIS qualifies for safe harbor protection under Rule 15a-6. In response, the SEC argues that the safe-harbor exemption is an affirmative defense that Defendants must plead in their answer and does not serve as a basis for dismissal of the Complaint.

Rule 15a-6 provides a limited, safe-harbor exemption from registration for a "foreign broker or dealer" that "[e]ffects transaction in securities with or for persons that have not been solicited by the foreign broker or dealer." 15 C.F.R. § 240.15a-6(a)(1). A defendant claiming an exemption from registration under Rule 15a-6(a)(1) "bears the burden of establishing that an exemption applies." *UBS Asset Mgt. (New York) Inc. v. Wood Grundy Corp.*, 914 F. Supp. 66, 68 (S.D.N.Y. 1996 (citing *SEC v. Ralston Purina, Inc.*, 346 U.S. 119, 126 (1953)). Fed. R. Civ. P. 8(c) provides that affirmative defenses shall be set forth in the answer to the complaint. The Rule is not limited by its terms to the enumerated defenses but applies to "any other matter constituting an avoidance or affirmative defense." *See United States on behalf of Maritime Admin. v. Continental Illinois Nat'l Bank & Trust Co.*, 889 F.2d 1248, 1253 (2d Cir. 1989) (quoting Fed. R. Civ. P. 8(c)). "A plaintiff's complaint should contain allegations that support [his] claim, but a plaintiff has no obligation to anticipate and refute potential affirmative defenses." *Rosen v. Brookhaven Capital Mgmt., Co., Ltd.*, 194 F. Supp. 2d 224, 227, 228 (S.D.N.Y. 2002). "What is relevant in opposition to a motion to dismiss is only whether the [p]laintiff can establish a *prima facie* case." *Chillemi v. Town of Southampton*, 943 F. Supp. 2d 365, 378 (E.D.N.Y. 2013); *Walker v. Schult*, 463 F. Supp. 3d 323, 341 (N.D.N.Y. 2020 ("A plaintiff need not anticipate every possible affirmative defense that may be raised.");

14

*see also Gomez v. Toledo*, 446 U.S. 635, 640, 100 S. Ct. 1920, 64 L. Ed. 2d 572 (1980) (holding that defendant in civil rights cases have the burden of pleading defense of qualified immunity, and plaintiff has no obligation to anticipate such a defense) (citing 5 Wright & Miller § 1276)).

The applicability of the safe-harbor exemption under Rule 15a-6 is an affirmative defense that Defendants must plead in their answer. It therefore does not constitute grounds for dismissal of the SEC's Complaint. *See Chillemi*, 943 Supp. 2d at 378 (citing *FDIC v. Haines*, 3 F. Supp. 2d 15, 159 (D. Conn. 1997)) (describing the applicability of an affirmative defense as a matter more appropriately addressed in a motion for summary judgment).

4.  Requisite Scienter as to Defendant Gunn

Defendant Gunn argues that the Complaint fails to plausibly that Gunn had the requisite scienter to violate Section 20(e) of the Exchange Act.

Whereas establishing a violation of Section 15(a) does not require proof of scienter, to plead a violation of Section 20(e), the complaint must allege facts showing "(1) a primary violation of the Exchange Act, (2) knowledge or reckless disregard of the violation by the aider and abettor, and (3) that the aider and abettor substantially assisted the primary violation." *SEC v. Apuzzo*, 689 F.3d 204, 211 & n.6 (2d Cir. 2012) (quoting *SEC v. DiBella*, 587 F.3d 553, 566 (2d Cir. 2009)); 15 U.S.C. § 78t(e). The knowledge and substantial assistance elements are SOMETHING. That is, where a complaint alleges a high degree of knowledge, the burden to plead substantial assistance is lessened. Conversely, "a high degree of substantial assistance may lessen the SEC's burden in proving scienter." *Apuzzo*, 689 F.2d at 215; *see also SEC v. Wey*, 246 F. Supp. 3d 894, 928–29 (S.D.N.Y. 2017) ("[T]he SEC's scienter burden is lessened significantly because the complaint is replete with allegations describing [one defendant]'s participation in almost every stage of the scheme…. [and his] alleged conduct was critical to the [scheme's] success.").

Although Defendants contest that GIS engaged in a primary violation, as to the aiding-and-abetting claim, Defendant argues that even "[a]ssuming *arguendo* the SEC can demonstrate the existence of an underlying Section 15(a) violation on the part of GIS, it has not adequately pled actual knowledge of any violation by Mr. Gunn." Motion, at 24. Gunn further faults the Complaint for failing to allege that he "recklessly" provided financial assistance, as the statute permits. *See* Motion, at 24 n.16 (citing 15 U.S.C. § 78t(e) ("any person that knowingly or recklessly provides substantial assistance")). Gunn does not argue that the Complaint fails to allege that he provided substantial assistance to GIS's violation of Section 15(a).

Neither the omission of the availability of a *lesser* scienter, nor its failure to allege that Gunn knew GIS was violating Section 15(a) of the Exchange Act, is fatal to the plausibility of the SEC's Complaint. A plaintiff need not plead a legal cause of action correctly to withstand a motion to dismiss, so long as its factual allegations state a claim for relief. *See, e.g.*, *Oneida Indian Nation of N.Y. v. County of Oneida*, 617 F.3d 114, 139 (2d Cir. 2010) ("As this Court has previously indicated, the essence of a cause of action is found in the facts alleged and proven by the plaintiff, not the particular legal theories articulated."); *Hack v. President & Fellows of Yale Coll.*, 237 F.3d 81, 89 (2d Cir. 2000) ("[W]e may not affirm the dismissal of [a] complaint because [the plaintiff] ha[s] proceeded under the wrong theory 'so long as [he has] alleged facts sufficient to support a meritorious legal claim.'" (citations omitted)).

Nor does the SEC have to specifically allege that Gunn knew that GIS was violating Section 15(a). "To establish knowledge, the SEC must show a 'defendant's general awareness of [his] overall role in the primary violator's illegal scheme.'" *SEC v. Paulson*, No. 18-CV-6718 (PGG), 2020 WL 6263180, at *14 (S.D.N.Y. Oct. 23, 2020) (citations omitted). The scienter requirement for aiding and abetting a regulatory violation "means awareness of the underlying facts, not the labels that the law places on those facts." *SEC v. Falstaff Brewing Corp.*, 629 F.2d 62, 77 (D.C. Cir. 1980) ("Except in very rare instances, no area of the law not

16

even the criminal law demands that a defendant have thought his actions were illegal.  A knowledge of what one is doing and the consequences of those actions suffices.").

The Complaint plausibly alleges the three elements of an aiding-and-abetting claim.  First, as discussed above, the Complaint plausibly alleges that GIS committed a primary violation of the securities law by failing to register as a broker-dealer, in violation of Section 15(a) of the Exchange Act.

Second, it alleges that Gunn had knowledge of the primary violation.  Although Defendant Gunn argues that there are insufficient factual allegations from which his knowledge of the primary violation can be inferred, viewing the Complaint in a light most favorable to the SEC, I find that there are sufficient factual allegations to support an inference of knowledge.  *See In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*, 763 F. Supp. 2d 423, 484 (S.D.N.Y 2011) (citing *Roth v. Jennings*, 489 F.3d 499, 501 (2d Cir. 2007)) ("In deciding a motion to dismiss a complaint for failure to state a claim [], the Court construes the complaint liberally and accepts as true the non-conclusory factual allegations in the complaint, and draws all reasonable inferences in the plaintiff's favor.").  The Complaint alleges that Gunn was aware of GIS's clearance and settlement activities as to U.S. customers, and that GIS was not registered with the SEC.  *See* Compl. ¶¶ 2, 10, 11, 23, 25.  It alleges that Gunn was the founder, chairman, compliance officer and principal, and in this capacity, directed and was involved in all aspects of GIS's operations, including its brokerage activities for U.S. customers.  *Id.* ¶ 23.  His responsibilities included onboarding new customers, opening and closing accounts, resolving trading and leverage issues, assisting day traders in setting up accounts, and communicating with GIS customers.  *Id.*  Further, as GIS's compliance officer, he signed and sent "numerous 'comfort letters'" to those broker-dealers, stating that "[GIS] acts on behalf of [sub-account holders] as custody and settlement agent," and in its capacity as settlement agent, GIS would "honour transactions which [the sub-account holder] have confirmed through [its] agreed trade

17

clearing process[.]" *Id.* ¶ 25.  A compliance officer's duties include ensuring that a firm is operating in compliance with all applicable law and regulations.  I therefore find it plausible that Gunn, acting in his capacity as compliance officer, would have known that a firm engaged in brokerage activity with U.S. customers purchasing U.S. securities has the obligation to register with the SEC and subject itself to, and comply, with the SEC's rules and regulations.

Although Gunn does not challenge the sufficiency of the allegations with respect to substantial assistance, I find that the Complaint plausibly alleges that Gunn substantially assisted GIS's violation.  As the founder, chairman, compliance officer and principal, Gunn directed and was involved in all aspects of GIS's operations, including its brokerage activities for U.S. customers.  *Id.* ¶ 23.  He traveled to the United States to meet with U.S. customers, and he assisted the day traders in setting up accounts at the U.S. introducing broker-dealers.  *Id.* ¶¶ 23, 25.  Finally, on at least one occasion, Gunn used GIS's capital to address a margin call in a backer's omnibus account at GIS, and sold securities from a backer's account for the same purpose.  *Id.* ¶ 26.  In short, the Complaint alleges that Gunn was involved substantially in various aspects of GIS's daily operations, spanning customer solicitation and transaction facilitation.

I therefore deny Defendant's motion to dismiss the claim against him for aiding and abetting GIS's violation of Section 15(a).  *See SEC v. Milan Capital Group, Inc.*, No. 00-CV-108, 2000 U.S. Dist. LEXIS 16204, at *27 (granting summary judgment against individual defendants who were aware that the defendant company was in violation of Section 15(a) and knowing of its violation, provided substantial assistance to the company by running day-to-day operations); *see also Apuzzo*, 689 F.3d at 215–17 (explaining that "a high degree of substantial assistance may lessen the SEC's burden in proving *scienter*").

## CONCLUSION

For the reasons stated above, Defendants' Motion to Dismiss is denied. Oral argument scheduled for October 25, 2021 is cancelled. The Initial Case Management Conference shall be held November 4, 2021, 10:30 am, Courtroom 14D. The Clerk of the Court shall terminate Motion to Dismiss (ECF No. 19).

SO ORDERED.

Dated:   October 19, 2021            /s/ Alvin K. Hellerstein
        New York, New York           ALVIN K. HELLERSTEIN
                                    United States District Judge